701 So.2d 524 (1997)
LIFE INSURANCE COMPANY OF GEORGIA
v.
Daisey L. JOHNSON.
1940357.
Supreme Court of Alabama.
August 15, 1997.
*525 Theodore B. Olson, Theodore J. Boutrous, Jr., and Jerry S. Fowler, Jr., of Gibson, Dunn & Crutcher, L.L.P., Washington, D.C.; and Davis Carr and James W. Lampkin II of Carr, Alford, Clausen & McDonald, L.L.C., Mobile, for appellant.
Sidney W. Jackson III and Robert J. Hedge of Jackson, Taylor & Martino, P.C., Mobile; and Wyman O. Gilmore, Jr., of Gilmore & Gilmore, Grove Hill, for appellee.

On Remand from the Supreme Court of the United States
SHORES, Justice.
Our first opinion in this case was issued on November 17, 1995. On application for rehearing, this Court withdrew that opinion and issued a new opinion, dated April 26, 1996. That opinion is published at 684 So.2d 685. On certiorari review, the Supreme Court of the United States vacated this Court's judgment and remanded this case for us to determine whether the punitive damages awarded in this case are reasonable under the guidelines established by the Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559,116 S.Ct. 1589,134 L.Ed.2d 809 (1996). See Life Ins. Co. of *526 Georgia v. Johnson, ___ U.S. ___, 117 S.Ct. 288, 136 L.Ed.2d 207 (1996)(memorandum).
In our April 26, 1996, opinion, we summarized the facts as follows:
"Ms. [Daisy L.] Johnson, a resident of Grove Hill, Alabama, is an 84-year-old woman who went through the third grade in school and who spent her life as a domestic worker. Because Ms. Johnson had dealt with [Life Insurance Company of Georgia] for over 25 years, paying premiums on nine different policies, she trusted its agents. Sometime before January 8, 1990, a Life of Georgia agent, Barbara Holt, came to Ms. Johnson's home to collect the monthly premiums on her existing policies. Ms. Holt recommended that Ms. Johnson purchase a Medicare supplement policy. The next week Ms. Holt returned and again discussed the Medicare supplement policy with Ms. Johnson, who agreed to purchase the policy. Ms. Johnson testified that Ms. Holt told her that the Medicare supplement policy would protect her. She testified: `If I got in the hospital, you wouldn't have to worry about your doctor bill, you could stay in there because they would pay your doctor bill, and I got it.' Ms. Holt filled out the application for Ms. Johnson.
"At first, Barbara Holt testified that she asked Ms. Johnson for her Social Security card; later, she testified that she asked Ms. Johnson for her Medicaid card and that she asked the questions on the application, one of which was whether Ms. Johnson was on Medicaid. At trial, Ms. Johnson disputed Ms. Holt's testimony that she was asked whether she was on Medicaid. Ms. Johnson showed the jury how she gave her cards to Ms. Holt, by pulling a vinyl holder out of her purse. She testified that she always kept her cards in this vinyl holder, which contained her Medicaid, Medicare, and Social Security cards.
"Despite the fact that Ms. Holt knew that it was illegal and against company policy to sell a Medicare supplement policy to Ms. Johnson, because she was on Medicaid, Ms. Holt completed the application and collected the premiums on the policy. Initially the premiums were $71 per month; by 1992, they had risen to $103 almost one-third of Ms. Johnson's fixed income. Over almost a three-year period from 1990 through 1992, Ms. Johnson paid a total of $3,132 in premiums on this policy."
684 So.2d at 687-88.
Ms. Johnson sued Life Insurance Company of Georgia ("Life of Georgia"), alleging that it had engaged in intentional and reckless fraud and fraudulent suppression by selling her a Medicare supplement insurance policy that was worthless to her because she was eligible for Medicaid. The jury returned a verdict in favor of Ms. Johnson, assessing compensatory damages at $250,000 and punitive damages at $15 million. Life of Georgia moved for a new trial or for a remittitur of damages. The trial judge held a hearing pursuant to Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and § 6-11-23(b), Ala.Code 1975.[1] Following the hearing, the trial judge, pursuant to Ala.Code 1975, § 6-11-21, ordered a remittitur of the punitive damages award to $12.5 million, and this remittitur was accepted by the plaintiff. This Court affirmed, conditioned upon the plaintiff's filing in this Court a remittitur of $7.5 million, resulting in an award of $5 million in punitive damages. 684 So.2d at 702. On remand from the United States Supreme Court, we affirm the judgment of the trial court, conditioned upon the plaintiff's filing in this Court a $9.5 million remittitur of punitive damages, reducing the punitive damages award to $3 million.
After we issued our April 26, 1996, opinion in this case, the United States Supreme Court granted certiorari review in this case, *527 along with several other cases involving jury verdicts awarding punitive damages. In its BMW opinion, the Supreme Court addressed the constitutional challenge to such verdicts and announced a decision requiring states to judicially review jury verdicts that award punitive damages, to determine whether such verdicts violate the tortfeasor's rights under the Due Process Clause of the United States Constitution. The Supreme Court emphasized that this postverdict judicial review must be meaningful, with special emphasis being given to three "guideposts": (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of punitive damages to the amount of actual or potential harm suffered by the plaintiff, and (3) a comparison of the amount of the jury's verdict with civil or criminal penalties (if any) that could be imposed under the law for comparable misconduct. BMW, 517 U.S. at ___, 116 S.Ct. at 1598-1603.[2] This Court, on the Supreme Court's remand of BMW, discussed these guideposts in BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala.1997) ("BMW II").
It is ironic, or at least curious, that the United States Supreme Court has selected mostly Alabama cases to examine for constitutional deficiencies in jury verdicts, because since 1915, long before it was thought to be mandated by the Federal constitution, Alabama has required judicial review of jury verdicts for excessiveness.[3] In reviewing the cases remanded to us for reconsideration in light of the Supreme Court's BMW opinion, we have done our best to give effect to every requirement we can read into the BMW opinion and to the requirements of Alabama law for post-verdict review as set forth in Hammond, Green Oil, and § 6-11-23(b), Ala. Code 1975.[4]

1. Degree of Reprehensibility
In discussing the first guidepost, the United States Supreme Court stated:
"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. As the Court stated nearly 150 years ago, exemplary damages imposed on a defendant should reflect `the enormity of his offense.' ... This principle reflects the accepted view that some wrongs are more blameworthy than others. Thus, we have said that `nonviolent crimes are less serious than crimes marked by violence or the threat of violence.'... Similarly, `trickery and deceit'... are more reprehensible than negligence."
BMW, 517 U.S. at ___, 116 S.Ct. at 1599. (Citations and footnotes omitted.) Alabama courts consider this "guidepost" in the excessiveness review mandated in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). This "guidepost" was enumerated as the second factor in the Green Oil analysis, but the factors set out there were not listed in any particular order of importance, insofar as the weight to be given them was concerned.
The trial judge wrote the following in the Hammond order:
"Clear and convincing evidence was presented at trial that Life of Georgia was aware of the fraudulent sale of these Medicare supplement policies. Considering the degree of reprehensibility of Life of Georgia's conduct, this Court considered the duration of the conduct, the degree of the awareness of the hazard which the conduct caused or [that] is likely to be caused in any concealment, cover-up or failure to *528 remedy that hazard, and the existence and frequency of similar past conduct. Evidence was submitted at the trial that another lawsuit had been filed in Mobile County Circuit Court alleging activity almost identical to the [activity] presented in the instant situation. Plaintiff further produced clear and convincing evidence through the testimony of three live pattern witnesses that Life of Georgia's conduct in selling these policies to elderly, uneducated, single black women was not an isolated event and had not ceased and these people were paying a very substantial portion of their fixed income for useless policies. Evidence was presented at trial that Life of Georgia was aware of the unfitness of its agent in selling this specialized type policy. Eric Peek testified that he trained Barbara Holt for Life of Georgia yet gave her no training relative to the Medicare supplement policies because he himself did not receive training to enable him to understand and properly sell these policies. Evidence was presented at trial that Life of Georgia began marketing the Medicare supplement policies in 1986 and that continuing through the date of the verdict in June of 1994, Life of Georgia had done nothing to ferret out and correct the problem. In fact, Life of Georgia's corporate officers testified during the Plaintiff's presentation of her case that Life of Georgia had done nothing to try to prevent the sale of Medicare supplement policies to unqualified persons even though in 1992 Life of Georgia had been faced with trial in Mobile County and experienced an adverse verdict. The Court can only conclude from Life of Georgia's failure to produce any rebuttal testimony as to Life of Georgia's failure to remedy this problem once it became known (approximately three years before trial) that Life of Georgia's conduct is egregious and callous disregard for the rights of Alabama adjusters [sic]. Further, the Court considers the status of the Plaintiff and those situated similarly to her in making this ruling."
Our independent review of the evidence indicates that it supports the trial court's characterization of the evidence. Robert M. Hayes, vice president for marketing, testified that in 1986 Life of Georgia began marketing a Medicare supplement policy and that it was not of major concern to the company that a Medicare supplement policy might be sold to customers who were on Medicaid. Hayes testified that question 12 on the application asks whether the person is covered under a state Medicaid program and that it was the responsibility of the Life of Georgia manager to give the agent materials to study in order to know how to handle a particular product. Hayes testified that, so far as he knew, Life of Georgia had undertaken no study to find out if any of the Medicare supplement policyholders were, because of Medicaid coverage, not qualified; nor had Life of Georgia reimbursed any policyholders for premiums.
Eric Peek, a former Life of Georgia agent, testified that he was told by his boss, Jack Neidermayer, not to keep the agents out of the field more than three days for training, but to get them out there and produce business. He described the "debit" business as going out to the house to collect the monthly premium from the policyholder. Peek testified that the company training was based more on the psychological aspects of persuasion than anything else. He further testified that persons aged 65 to 85 were the target group for the sale of Medicare policies. He stated that the three reasons people will buy insurance are love, greed, or fear, and that fear was the main motivation of those persons over age 65. Peek stated that while out in the field he encountered a woman who had gotten Medicaid coverage after buying a Life of Georgia Medicare supplement policy. He said he asked the Life of Georgia manager, Jack Neidermayer, what to do in that situation and that he was told to tell the woman to keep the insurance because she could come off of Medicaid and, if she did, would need the Medicare supplement. Peek testified that agents were pressured to produce the quotas required by the company or else be gone. Peek testified that on one occasion he was with the agent who was collecting premiums from Daisey Johnson. He said that on that occasion Ms. Johnson told them she could no longer afford the coverage, because, she said, the premiums were too high. Peek said he showed her an article from a Mobile *529 newspaper that told of a couple who had lost their home to a medical center because of a judgment, and that Ms. Johnson then paid the premium. Peek testified that while he was employed with Life of Georgia he suggested to the regional vice president, Jack Neidermayer, that the company should find the people who were in income brackets for Medicaid and refund their premiums. Neidermayer responded by saying that they needed to find people that would buy insurance. Peek testified that Life of Georgia never undertook any action to correct the problem of selling the Medicare supplement policy to people who were not qualified.
Another former Life of Georgia agent, James Russell Clark, testified that his training could be summed up in three words: "Get the money." He described his only training for the job as picking up information by going with other agents on sales interviews and in servicing the existing business.
Life of Georgia's corporate officers testified during the plaintiff's presentation of her case that Life of Georgia had done nothing to try to prevent the sale of Medicare supplement policies to unqualified persons even though in 1992 Life of Georgia had been faced with trial in Mobile County and had experienced an adverse verdict of $1 million. See Foster v. Life Ins. Co. of Georgia, 656 So.2d 333 (Ala.1994). The company continued its history of noncompliance, giving rise to the conclusion that even a million dollar sanction against the company was not sufficient to deter its misconduct.
In discussing the degree-of-reprehensibility guidepost, the United States Supreme Court stated that, just as nonviolent crimes are less serious than violent crimes, trickery and deceit are more reprehensible than negligence. BMW, 517 U.S. at ___, 116 S.Ct. at 1599. The Court went on to say that repeated misconduct is more reprehensible than an individual instance of malfeasance. Id., 517 U.S. at ___, 116 S.Ct. at 1600.
Applying the first guidepost, the reprehensibility of the defendant's conduct, we conclude that the evidence was sufficient to permit the jury to conclude that Life of Georgia's egregiously improper conduct was sufficiently reprehensible to give rise to tort liability and was sufficient to establish the high degree of culpability that warrants a substantial punitive damages award. Life of Georgia was aware that its actions or omissions were causing harm, but it did not change its policy. It consciously disregarded the rights of old, indigent, and uneducated citizens of Alabama.

2. Ratio of Punitive Damages to the Actual or Likely Harm
As to the second guidepost, the United States Supreme Court noted that the "most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff," and it noted "[t]he principle that exemplary damages must bear a `reasonable relationship' to compensatory damages." BMW, 517 U.S. at ___, 116 S.Ct. at 1601. The Supreme Court rejected the notion that a purely mathematical formula could mark the constitutional line:
"Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award.... Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.... In most cases, the ratio will be within a constitutionally accepted range, and remittitur will not be justified on this basis."
517 U.S. at___ ___, 116 S.Ct. at 1602-03. (Citations and emphasis omitted.)
In considering BMW on remand, this Court rejected the "easy answer of adopting one ratio that would apply to all." This Court stated that "[t]o do so would frustrate the purpose of punitive damages, which is to punish and deter a defendant's misconduct." BMW II, supra, 701 So.2d at 513.
*530 It is instructive to note that within a short time after it released its BMW decision, the United States Supreme Court denied certiorari review of several cases that were before it on excessiveness claims:
1. The Supreme Court refused to review a case from the Court of Appeals for the Ninth Circuit that affirmed a $2.8 million compensatory award and a $14 million punitive award, about a 5:1 ratio. Liberty Mutual Ins. Co. v. Chemstar, Inc., ___ U.S. ___, 116 S.Ct. 1847 [134 L.Ed.2d 948] (1996).
2. The Court refused to review a 10th Circuit case that affirmed a judgment awarding $284,000 in compensatory damages and $2,250,000 in punitive damages, a ratio of almost 8:1. Wolfberg v. Greenberg, ___ U.S. ___, 116 S.Ct. 1847 [134 L.Ed.2d 948] (1996) (mem.).
3. The Supreme Court denied certiorari review in a freedom-of-speech case from the 9th Circuit in which the plaintiff was awarded $200 in compensatory damages and $78,500 in punitive damages, a ratio of 393:1. The trial court had also awarded the plaintiff attorney fees and costs. Murray v. Laborers Union Local No. 324, 55 F.3d 1445 (9th Cir.1995), cert. denied,  U.S. ___, 116 S.Ct. 1847 [134 L.Ed.2d 948] (1996).
4. The Court refused a second review of Honda Motor Co. v. Oberg. On remand after the United States Supreme Court's first review (512 U.S. 415, 114 S.Ct. 2331 [129 L.Ed.2d 336] (1994)), the Oregon Supreme Court had affirmed, again, the entire $5 million punitive award based on a verdict in a personal injury/products liability case arising out of a child's injury on an all-terrain vehicle. See 320 Or. 544, 888 P.2d 8 (1995) (on remand). The punitivecompensatory ratio was 5.4:1. See Honda Motor Co. v. Oberg, ___ U.S. ___, 116 S.Ct. 1847 [134 L.Ed.2d 948] (1996) (mem. denying certiorari review).
5. In a Maryland case, the jury awarded $104,000 in compensatory damages, plus interest, and $3 million in punitive damages. The trial court reduced the punitive damages to $1.5 million because the defendant's net worth was only $3 million; the reduced award gave a punitive-compensatory ratio of almost 15:1. Fraidin v. Weitzman, 93 Md.App. 168, 611 A.2d 1046 (1992), cert. denied, 329 Md. 109, 617 A.2d 1055 (1993), cert. denied, ___ U.S. ___, 116 S.Ct. 1846 [134 L.Ed.2d 948] (1996).
See Bruce J. McKee, The Implications of BMW v. Gore for Future Punitive Damages Litigation: Observations from a Participant, 48 Ala. Law Rev. 175, 195-97 (Fall 1996) (discussing those five cases). The United States Supreme Court's disposition of those cases leads us to conclude that the Court recognizes that varying ratios might be sustainable, depending upon all of the factors, with special emphasis on the guidelines.
In Union Security Life Insurance Co. v. Crocker, [Ms. 1931672, August 15, 1997] ___ So.2d ___ (Ala.1997), also decided today, this Court affirmed a punitive damages award, conditioned upon the plaintiff's filing a remittitur reducing the award from $2 million to $1 million. This Court found in that case that while the defendant Union Security's misconduct was highly reprehensible, the misconduct was an aberration for Union Security. The conduct of Life of Georgia in this case was far more reprehensible than that of Union Security. The financial impact Life of Georgia's conduct had on Daisey Johnson greatly exceeded the financial impact Union Security's conduct had on the Crockers. Although it is not stated in the Union Security case, common sense suggests that the Crockers' payments on the premium of $1,659.61 for the credit life policy sold to them did not amount to one third of their income. If it had, the bank would not have lent them the mortgage money in the first place.
Unlike Dr. Gore and other BMW purchasers, who the United States Supreme Court concluded were not threatened with any additional potential harm by BMW's nondisclosure policy, and unlike the Crockers, who experienced an "isolated occurrence" in Union Security, the plaintiff here proved that there was a sizable group of Alabama citizens who were put at risk by the defendant's wrongful conduct. She proved that over 116,000 Alabamians have both Medicare and *531 Medicaid; given the Medicare and Medicaid eligibility standards, we can conclude that these Alabamians are both old and poor.
Applying the Supreme Court's second guidepost, we conclude that following the remittitur of punitive damages to $3 million, as we order today, the ratio of exemplary damages to the compensatory damages of $250,000 will bear a reasonable relationship, given the facts in this case.

3. Sanctions for Comparable Misconduct
The third guidepost stated by the United States Supreme Court in BMW is "[c]omparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." 517 U.S. at ___, 116 S.Ct. at 1603. The Supreme Court stated that a reviewing court engaged in determining whether a punitive damages award is excessive should "`accord "substantial deference" to legislative judgments concerning the appropriate sanctions for the conduct at issue.'" Id., 517 U.S. at ___, 116 S.Ct. at 1603, quoting Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 301, 109 S.Ct. 2909, 2934, 106 L.Ed.2d 219 (1989) (O'Connor, J., concurring in part and dissenting in part).
In our April 26, 1996, opinion in this case, we took judicial notice of the fact that the Alabama Insurance Code does not provide strong sanctions for insurance fraud:
"Alabama citizens who become the victims of fraud have little recourse other than through litigation. The record in this case is replete with expert testimony to the effect that the State Insurance Department has little power to regulate agents, and we judicially know that litigation is often the only weapon defrauded citizens have. Punitive damages have historically been part of the remedy for such victims, and to get that remedy they must prove that the defendant intentionally inflicted the injury for which punishment is sought.
684 So.2d at 693. A willful violation of the Alabama Insurance Code is punishable as a misdemeanor, by a fine of not more than $1,000 or by imprisonment in the county jail, or by a sentence to hard labor for the county for a period not to exceed one year or by both such a fine and imprisonment or hard labor, in the discretion of the court. Ala. Code 1975, §§ 13A-5-11, 13A-5-12(a) (part of the Criminal Code); and §§ 27-1-12, 27-12-17, and 27-12-23 (part of the Alabama Insurance Code). See Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 23, 111 S.Ct. 1032, 1046, 113 L.Ed.2d 1 (1991). The Alabama Criminal Code provides that theft by deception of more than $1,000 of another's funds is a Class B felony, punishable by imprisonment for 2 to 20 years. § 13A-8-3; § 13A-5-6(a)(2). As this Court noted on remand in BMW II, supra, "under the Alabama Deceptive Trade Practices Act, Ala.Code 1975, § 8-19-5, the maximum sanction for committing a fraudulent act against an Alabama consumer is ... $2,000." 701 So.2d at 514. This Court concluded: "Because the legislature has set the statutory penalty for deceitful conduct at such a low level, there is little basis for comparing it with any meaningful punitive damages award, particularly where the defendant is wealthy and the profit gained from the fraudulent act is substantial." 701 So.2d at 514.
Applying the third guidepost, we find that in this case, as in BMW II and in Union Security, there is no basis for comparing the statutory penalty for deceitful conduct with any meaningful punitive damages award.
In its April 26, 1996, opinion reviewing the jury verdict in this case, this Court set forth procedures for bifurcating a trial in which a jury awards punitive damages, adopting the procedures recommended by Justice Houston in his special concurrence in Charter Hospital of Mobile, Inc. v. Weinberg, 558 So.2d 909 (Ala.1990). See 684 So.2d at 696-97. Also in our April 26, 1996, opinion, 684 So.2d at 697-99, we held that, to prevent undeserved windfalls to successful plaintiffs, where a jury awards punitive damages a part of the award must be paid to the state general fund. We now hold that the judicial review required by the Supreme Court of the United States in BMW v. Gore, coupled with the procedure already established by this court in Hammond and Green Oil, are sufficient safeguards to assure that no tortfeasor found by a jury to merit punishment *532 by an award of punitive damages is denied due process. We also hold that bifurcation of trials is not necessary to assure that tortfeasors receive due process. We also conclude that it is not necessary to share punitive awards with the state treasury in order to prevent windfalls to those who pursue claims against tortfeasors. Therefore, that portion of our April 26, 1996, opinion establishing a bifurcation procedure, see 684 So.2d at 696, is overruled, and that portion of the April 26, 1996, opinion requiring an allocation of punitive damages, see 684 So.2d at 697, is also overruled. Trials of cases in which punitive damages are sought and awarded will continue to be conducted in one phase, in which the jury will determine the question of liability and, upon finding liability, will assess punitive damages. The admissibility of evidence in such trials will be determined by the same evidentiary principles that applied before we issued our April 26, 1996, opinion in this case.
Where jury verdicts are challenged as excessive, the trial courts will continue to conduct hearings pursuant to Hammond, Green Oil, BMW, and § 6-11-23(b). A trial court conducting such a hearing will then apply the Hammond, Green Oil, and BMW factors, as well as the considerations stated in § 6-11-23(b), to review the damages award and determine whether the evidence warrants a remittitur of the jury's verdict. If a punitive damages award is appealed, the appellate court will conduct its own review of the punitive damages award, in accordance with Hammond, Green Oil, and BMW.
On remand, we have thoroughly reviewed the evidence and the law in this case, in light of the United States Supreme Court's holding in BMW and this Court's holding on remand in BMW II, supra, as well as the holdings in previous cases of both this Court and the United States Supreme Court. In our April 26, 1996, opinion reviewing the jury verdict in this case, we outlined the Hammond-Green Oil factors and concluded that an award of $5 million in punitive damages was not excessive for punishment and deterrence specific to Life of Georgia, considering all of the facts of the case:
"We conclude, as did the trial judge, that the conduct of this defendant was egregious and reprehensible and resulted in a great financial hardship to some of the most vulnerable members of our society. Life of Georgia fraudulently sold policies to people on Medicaid that were totally worthless to the victims of the fraud. Life of Georgia had no risk under these fraudulently sold policies. The practice was a sham and would never have been permitted in this state if the activities of insurance agents were properly regulated. However, as reprehensible as Life of Georgia's conduct was, it is not the most [odious] this Court has been required to review. Without in any way condoning the conduct, we nevertheless are compelled, when comparing this conduct with other acts perpetrated upon Alabama citizens, to reduce the award against the defendant Life of Georgia to $5 million. Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). It is the opinion of this Court that $5 million is not excessive for punishment and deterrence specific to Life of Georgia, considering all of the facts of this case."
684 So.2d at 700-01. (Footnote omitted.)
We now reconsider specifically each of the Hammond-Green Oil factors, as set forth above. First: Whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct, as well as the harm that actually has occurred. Justice Breyer, in his concurring opinion in BMW v. Gore, categorized "tricking the elderly out of their life savings" as among the "most serious kinds of misrepresentations." 517 U.S. at ___, 116 S.Ct. at 1605-06. Certainly, that serious kind of misrepresentation occurred in this case to Daisey Johnson, who was defrauded out of one-third of her fixed monthly income.
Second: The degree of reprehensibility of the defendant's conduct, including the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct. The record establishes that Life of Georgia's corporate officers were aware that some of its salespeople were acting wrongfully, but did *533 nothing to prevent it and did not act to remedy the situation. The trial judge stated in his Hammond order:
"Next, the president of Life of Georgia testified that Life of Georgia ceased doing business in Alabama and would never return. He also testified that if any policyholder of Life of Georgia had been sold a Medicare supplement policy who had received Medicaid benefits, that person's premiums would be immediately refunded. He further stated that Life of Georgia had undertaken a program in Alabama to determine whether there were any policyholders situated such as Daisey Johnson. However, the Court is aware that following the testimony of Life of Georgia's president, a witness testified by deposition for Plaintiff that her 91-year-old father was on Medicaid, had been sold a Medicare supplement policy, and that she had demanded Life of Georgia to return his premiums. Ms. Pernell, the daughter of the person sold the Medicare supplement policy, was informed by Life of Georgia that they would not refund the premiums. This testimony contradicts that of the president and concerns the Court as to the quality of Life of Georgia's assertion that it would refund premiums once an unqualified policyholder came forward.
As previously stated, theft by deception of more than $1,000 is a Class B felony that is punishable under the Criminal Code by imprisonment for 2 to 20 years. Ala.Code 1975, § 13A-8-3. The trial judge found in his Hammond order that Life of Georgia's conduct was reprehensible:
"The harm which was committed is even more egregious because Life of Georgia refuses to admit or concede any wrongdoing whatsoever and merely [attributes] the sale of this policy [to] a `miscommunication.' Life of Georgia has profited from such `miscommunications.'"
Third: The profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss. While the actual profitability of the sale of these policies to Life of Georgia is not known, we do know that Life of Georgia had no risk under these fraudulently sold policies.
Fourth: The financial position of the defendant. The trial judge stated in his Hammond order:
"This Court finds that the economic impact of the verdict on Defendant Life of Georgia is slight. In 1993, the company had assets exceeding $2.3 billion. Investment income alone totaled $173 million for 1993 and the company has over $1.1 billion in reserve. The company has testified that it has sufficient resources to pay the judgment if it should be affirmed. The financial position of Life of Georgia does not support any reduction in this verdict."
During the Hammond hearing, Life of Georgia's president, James C. Brooks, Jr., was questioned on cross-examination: "If you are required to pay the $15 million, it would not put Life of Georgia out of business; will it?" Mr. Brooks replied, "That payment alone by itself would not put Life of Georgia out of business."
Fifth: All the costs of litigation. In reference to the costs of litigation, the trial judge stated in his Hammond order:
"The Court finds that the verdict should be high in order to encourage a plaintiff such as this, and her attorneys, to pursue this type of case. The Court is of the opinion that there are many people situated such as Plaintiff who are unable due to sickness, age, infirmity or whatever to pursue such a case. The Court has considered whether the cost of this litigation favors remittitur and is of the opinion that this factor does not weigh in favor of reducing this verdict."
Sixth: The imposition of any criminal sanctions on the defendant for its conduct must be taken in mitigation. No criminal sanctions have been imposed upon Life of Georgia.[5]
*534 Seventh: The existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation. Life of Georgia suffered an adverse verdict of $1,000,000 in Foster v. Life of Georgia, supra. We must view this fact as militating against the punitive damages award.
We have reexamined the record in this case and we have reviewed the verdict for excessiveness, both under our established standards and in light of the additional factors set out by the Supreme Court in BMW. We have also reexamined the evidence to determine whether Alabama's interest in protecting its citizens from the kind of fraud practiced by Life of Georgia and in punishing tortfeasors and deterring others can be achieved by a lesser award. On reexamination, we conclude that an award of $3 million in punitive damages will advance Alabama's policy of punishing and deterring the kind of conduct of which the jury has found Life of Georgia guilty.
After careful and thoughtful consideration, we conclude that the portion of the trial court's judgment awarding compensatory damages in the amount of $250,000 is due to be affirmed. However, we conclude that the award of punitive damages should be reduced to $3 million. The judgment is affirmed, on the condition that the plaintiff, within 28 days of the date of this opinion, file in this Court a remittitur reducing the punitive damages to $3 million. If the plaintiff does not file such a remittitur, then the judgment shall be reversed and the defendant granted a new trial. Also, as indicated earlier in this opinion, our April 26, 1996, opinion is overruled to the extent it established a bifurcation procedure and required an allocation of punitive damages.
AFFIRMED CONDITIONALLY.[*]
ALMON, KENNEDY, and COOK, JJ., concur.
BUTTS, J., concurs specially.
HOOPER, C.J., and MADDOX, HOUSTON, and SEE, JJ., concur in part and dissent in part.
BUTTS, Justice (concurring specially).
Although I did so with several caveats, I originally concurred with the majority's establishment of a bifurcated trial where a plaintiff seeks punitive damages, because I believe that such a procedural change is within this Court's authority. However, based upon the judicial review of punitive damages awards required by BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), I agree with the majority that the bifurcation process is no longer necessary to protect the tortfeasor's due process rights. I originally dissented from the majority's holding requiring apportionment of a punitive damages award between the plaintiff and the State, because I did not believe that it was within this Court's authority to require that apportionment. For that reason, I now concur with the majority's holding overruling the apportionment requirement.
As to the issue of the reasonableness of the punitive damages award, I write to emphasize the well-established principle that "exemplary damages imposed on a defendant should reflect `the enormity of his offense,'" BMW, 517 U.S. 559, ___, 116 S.Ct. 1589, 1599, 134 L.Ed.2d 809 (1996), quoting Day v. Woodworth, 54 U.S. (13 How.) 363, 371, 14 L.Ed. 181 (1852). The enormity of Life of Georgia's offense against Daisey Johnson and other elderly and financially vulnerable citizens in this state is clearly revealed in this case. Indeed, virtually every aggravating factor associated with particularly reprehensible conduct is presented here. The evidence reveals that Life of Georgia marketed its Medicare policies through a pattern of *535 trickery and deceit, carried out with affirmative acts of misconduct against those least able to defend themselves. Life of Georgia's agent intentionally exploited Mrs. Johnson's age, poverty, and lack of education, in order to sell her a worthless policy that for three years cost her almost a third of her monthly fixed income. Moreover, it is obvious that Life of Georgia regularly trained its agents to "get the money" from elderly insureds by playing upon their fears and emotions, while deliberately failing to teach its agents even the rudiments of the insurance product they were driven to sell. There is evidence that, as of the date of the verdict in this case, Life of Georgia had done nothing to correct its misconduct, and that it was undeterred by an adverse verdict returned in the Mobile Circuit Court, based upon similar misconduct. See Foster v. Life Ins. Co. of Georgia, 656 So.2d 333 (Ala.1994). Life of Georgia is a repeat offender, and I believe that, as the United States Supreme Court suggests, "strong medicine is required to cure the defendant's disrespect for the law." BMW, 517 U.S. at ___, 116 S.Ct. at 1599. I agree that a punitive damages award of $3 million is the proper dose.
HOUSTON, Justice (concurring in part and dissenting in part).
I concur with the reasoning of Justice See's dissent; however, based upon the reprehensibility of the defendant's conduct directed against a vulnerable plaintiff, which I do not find to be mitigated by any of the factors set forth in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), coupled with a proven pattern and practice of such conduct, I would hold that the defendant's conduct justifies a punitive award greater than Justice See would uphold. I would hold that the defendant's conduct justifies a punitive award of up to eight times the compensatory damages, or $2 million. Thus, I dissent from the award of $3 million.
I concur with Justice Shores in abolishing the proposed rule requiring bifurcated trials in punitive damages cases and in abolishing the rule that would divide certain punitive damages awards with the State. The United States Supreme Court, in BMW of North America, Inc. v. Gore, 517 U.S. 559,116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), instructed this Court as to what is necessary to "fix" any due process problems involving punitive damages. As long as this Court adheres to the BMW principled approach to punitive damages, I do not believe that a bifurcated trial is necessary to assure that a defendant receives the process he, she, or it is due. (I voted for the bifurcation procedure initially, believing, as did Justice O'Connor,[6] that this would be a way to assure that defendants received procedural due process.)
I also believe that the principled approach to the question of excessive punitive damages, required by the United States Supreme Court in BMW, will keep plaintiffs from receiving "windfalls" in punitive damages, and, therefore, that there is no longer any reason for diverting some of the punitive damages to the State.
SEE, Justice (concurring in part and dissenting in part).
I concur with the abandonment of the judicially created mechanisms of (1) the bifurcation of punitive-damages trials between liability and damages phases, and (2) the payment of a portion of punitive damages awards to the State of Alabama. I dissent, however, from the majority's pliant application of the federal due process standard for constraining awards of punitive damages and its failure to adopt a traditional state law reasonableness standard for constraining such awards.
An indispensable characteristic of a sound legal system is the production of predictable results, which guards against the arbitrary use of governmental power[7] and allows the *536 bench, the bar, and, most importantly, the people to order their affairs.[8] This Court's punitive damages jurisprudence has failed to produce predictable results.[9]
Justice Breyer observed in his concurrence in BMW of North America, Inc. v. Gore, 517 U.S. 559, ___, 116 S.Ct. 1589, 1609, 134 L.Ed.2d 809 (1996) ("BMW"), that this Court's pliant application of the standards set forth in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), for constraining the amount of punitive damages awards, "violate[d] the basic guarantee of nonarbitrary governmental behavior that the Due Process Clause provides." While facially the Green Oil standards provided constraints on arbitrary punitive damages awards, see Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), as interpreted by this Court in BMW of North America, Inc. v. Gore, 646 So.2d 619 (Ala. 1994) ("BMW I"), they in fact did not. Consequently, the Supreme Court of the United States, though not injecting itself into the determination of what would be the proper state law reasonableness standard, did establish a three-factor review for courts to use in determining whether punitive damages awards are so large that they clearly exceed the "outer limit" of federal due process. BMW, 517 U.S. at ___ ___, 116 S.Ct. at 1599-1604 (determining whether punitive damages awards are excessive under the Due Process Clause by assessing the reprehensibility of the defendant's conduct, the ratio of punitive damages to compensatory damages, and sanctions for comparable misconduct).
This constitutional outer limit necessarily offers only the broadest suggestion of what is impermissible. BMW, 517 U.S. at ___, 116 S.Ct. at 1602. It is incumbent on this Court to provide Alabama trial courts, and ultimately the public, with the guidance that will produce fair, consistent, and predictable results, within the broad range of constitutional acceptability. The majority opinion fails to provide this guidance.[10]
*537 The majority recites the three due process guideposts and the Green Oil factors and restates the facts set forth in this Court's original opinion. See Life Ins. Co. of Georgia v. Johnson, 684 So.2d 685 (Ala.1996) ("Johnson I"). Critically missing is the analytical connection to the $3 million punitive award. Until this Court provides a guiding rationale for trial courts and the bar, future punitive awards in Alabama may sometimes be lower, but will remain arbitrary.[11]
To provide a more predictable and ordered approach for the review of punitive damages awards, I would apply the more restrictive state law reasonableness analysis set forth in Justice Houston's special concurrence in BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala.1997) ("BMW II"). Accordingly, I adopt the following language from that concurrence:
"The Origin of the Problem
"A
"Before its decision in [BMW], the Supreme Court had never overturned a state court's award of punitive damages as violating federal due process requirements. The apparent reason for this is that state law reasonableness standards for determining the amount of the award had historically been stricter than the federal excessiveness standard. See Haslip, 499 U.S. at 17, 111 S.Ct. at 1043 (`So far as we have been able to determine, every state and federal court that has considered the question has ruled that the common-law method for assessing punitive damages does not in itself violate due process.... In view of this consistent history, we cannot say that the common-law method for assessing punitive damages is so inherently unfair as to deny due process ....') (citation omitted). As Justice Stevens noted in TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 113 S.Ct. 2711,125 L.Ed.2d 366 (1993):
"`[W]e do not suggest that a defendant has a substantive due process right to a correct determination of the "reasonableness" of a punitive damages award.... [S]tate law generally imposes a requirement that punitive damages be "reasonable." ... A violation of a state law "reasonableness" requirement would not, however, necessarily establish that the award is so "grossly excessive" as to violate the Federal Constitution. Furthermore, ... our cases have recognized for almost a century that the Due Process Clause of the Fourteenth Amendment imposes an outer limit on such an award....'
"509 U.S. at 458, n. 24, 113 S.Ct. at 2720, n. 24 (emphasis added). Thus, application of the stricter state law reasonableness standard has traditionally kept awards of punitive damages from exceeding the more liberal `outer limit' imposed by the federal excessiveness standard.
"B
"The state law reasonableness standard derives from the judicial mechanism of remittitur, which plays an integral role in the procedure for respecting and controlling the jury's function to punish tortfeasors. Common law judges traditionally accorded jury awards of punitive damages a rebuttable presumption of correctness. See, e.g., Leith v. Pope, 2 Black. W. 1327, 1328, 96 Eng. Rep. 777, 778 (C.P.1779) (`[I]n cases of tort the Court will not interpose on account of the largeness of damages, unless they are so flagrantly excessive as to afford an internal evidence of the prejudice and partiality of the jury'). At some point, however, when the facts indicated that the presumption of correctness waned and was finally overcome, common law judges used remittitur to reduce unreasonable awards that resulted from the passion or prejudice of the jury. Numerous English cases upheld the power of common law courts to order a new trial if the judges deemed the punitive damages unreasonable. See, e.g., *538 Gilbert v. Burtenshaw, 1 Cowper 230, 98 Eng. Rep. 1059 (K.B.1774) (Mansfield, J.) (recognizing judicial power to grant new trial when jury awards of damages are excessive).10
"American courts adopted the same procedure. In Whipple v. Cumberland Mfg. Co., 29 F. Cas. 934, 937-38 (C.C.Me.1843), Justice Story, sitting as a Circuit Justice, acknowledged the judicial duty to set aside a jury verdict for unreasonable damages. He had previously stated the American doctrine as follows:
"`As to the question of excessive damages, I agree, that the court may grant a new trial for excessive damages.... It is indeed an exercise of discretion full of delicacy and difficulty. But if it should clearly appear that the jury have committed a gross error, or have acted from improper motives, or have given damages excessive in relation to the person or the injury, it is as much the duty of the court to interfere, to prevent the wrong, as in any other case.'
"Blunt v. Little, 3 F. Cas. 760, 761-62 (C.C.Mass.1822) (Story, J., sitting as Circuit Justice).
"In National Surety Co. v. Mabry, 139 Ala. 217, 225, 35 So. 698, 701 (1903), this Court recognized the judicial duty to reduce unreasonable awards of punitive damages, by citing with approval Lord Mansfield's opinion in Gilbert, supra, and Justice Story's opinion in Whipple, supra. See, e.g., Cook & Laurie Contracting Co. v. Bell, 177 Ala. 618, 635, 59 So. 273, 279 (1912) (`Remittiturs are favored by the courts in proper cases, for the promotion of justice and the ending of litigation') (quoting Richardson v. Birmingham Cotton Mfg. Co., 116 Ala. 381, 22 So. 478 (1897)); Airheart v. Green, 267 Ala. 689, 692-93, 104 So.2d 687 (1958) (affirming trial court's order of remittitur of damages).
"In Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), this Court established standards for trial judges to apply in granting or denying new trial motions on the grounds of excessiveness of punitive damages and for appellate courts to use in reviewing the trial judges' actions.
"C
"We recognized in Green Oil, 539 So.2d at 222-24, that the excessiveness review measures when the rebuttable presumption of correctness for jury awards of punitive damages wanes and is finally overcome. Accordingly, Green Oil provided both punitive factors and protective factors. The Green Oil punitive factors include: (1) removing the profit that the tortfeasor gained from his wrongful conduct; (2) providing a penalty that is sufficiently large to `sting' the tortfeasor, given his financial position; and (3) considering the reasonable costs of litigation. Id. at 223. The Green Oil protective factors include: (1) ensuring a reasonable relationship between the size of the punitive damages award and the actual or likely harm resulting from the tortfeasor's wrongful conduct; (2) allowing only truly reprehensible conduct to justify sizable punitive damages awards; (3) ensuring that the punitive damages award does not devastate the tortfeasor, given his financial position; and (4) reducing the punitive damages award by any civil or criminal penalties imposed on the tortfeasor for the same conduct. Id. at 223-24. The difference between the Supreme Court's decision in this case and its decision in Haslip, supra, then, can be explained by looking to the rigor of this Court's application of the protective Green Oil factors.11 This Court's less stringent application of these factors in [BMW I] put our state law in conflict with the Supreme Court's application of the three federal due process guideposts.12
"... The State Law Solution
"To resolve the present conflict between the state law reasonableness standard and the federal law excessiveness standard, I would return to the traditional, restrictive Alabama reasonableness standard. Although the Supreme Court, and thus, this *539 Court, cannot precisely define the `outer limit' of federal due process, 517 U.S. at ___, 116 S.Ct. at 1602 (`[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula'), we can more precisely define the `inner boundary' of state law reasonableness, Hammond, 493 So.2d at 1378 (`[T]he responsibility to adopt standards [for requiring remittitur] lies with this Court'). To the extent this definition comports with history by producing a common law reasonableness standard that is stricter than the federal law excessiveness standard, it would both avoid conflict with binding Supreme Court precedent and provide a more workable standard for Alabama courts to apply. Specifically, I would reinvigorate the following protective Green Oil factors:

"Ratio of Punitive Damages to Compensatory DamagesAlthough the Supreme Court rejected any fixed ratio, it recognized that punitive damages `must bear a "reasonable relationship" to compensatory damages.' 517 U.S. at ___ ___, 116 S.Ct. at 1601-02. I agree with the majority that this Court should not adopt a specific ratio as a judicially imposed cap on punitive damages. At the same time, I recognize that of the protective Green Oil factors, the ratio of punitive damages to compensatory damages provides the most practical guideline for Alabama trial judges.13 Both the Alabama Legislature and Congress have established treble damages as the most common punitive standard.14 I would therefore adopt that three-to-one ratio, not as any kind of rigid restraint, but to serve as a benchmark against which to measure reasonableness. Significant deviations above the three-toone benchmark should require special justification.

"Reprehensibility of the ConductThe Supreme Court stated that the degree of reprehensibility of the defendant's conduct was `[p]erhaps the most important' guidepost for assessing whether a punitive damages award is excessive. 517 U.S. at ___, 116 S.Ct. at 1599. To justify a sizable punitive damages award, the Supreme Court requires evidence of `indifference to or reckless disregard for the health and safety of others,' as opposed to mere economic harm. Id. For purely economic harm to justify a substantial award, it must be coupled with intentional, `affirmative acts of misconduct, ... financially vulnerable [victims,] ... [or] prohibited conduct [engaged in] while knowing or suspecting that it was unlawful.' Id.

"To justify a punitive damages award of greater than three times compensatory damages, I would define the Green Oil factor of reprehensibility to require: (1) endangerment of the physical health and safety of others; or (2) economic harm resulting from an intentional misrepresentation, deceit, or concealment of a material fact, as set out in Ala.Code 1975, § 6-11-20(b)(1), coupled with either (a) conduct repeated in spite of prior punishment, or (b) a substantial number of similar misrepresentations or acts of concealment.15

"Similar Civil and Criminal SanctionsThe Supreme Court stated that in assessing the size of a punitive damages award, a court should `accord substantial deference' to statutory fines or civil or criminal sanctions for comparable misconduct. 517 U.S. at ___, 116 S.Ct. at 1603. The Supreme Court also noted that a statutory fine could be multiplied by the number of wrongful acts for comparison to the punitive damages award. 517 U.S. at ___, 116 S.Ct. at 1603.
"I would define the Green Oil factor of comparable civil and criminal sanctions to require comparison of the punitive damages award to civil or criminal penalties for similar misconduct, if such penalties exist.16 To justify an award of greater than three times compensatory damages, the comparable civil or criminal penalties must involve substantial monetary fines or imprisonment.
"The vigilant and consistent application of these Green Oil factors to the specific facts of each case would, I believe, eliminate the danger that Alabama punitive damages awards will transgress the `outer *540 limit' imposed on those awards by federal due process requirements."
10 "See also Jones v. Sparrow, 5 T.R. 257, 101 Eng. Rep. 144 (K.B.1793) (new trial granted for excessive damages); Hewlett v. Cruchley, 5 Taunt. 277, 281, 128 Eng. Rep. 696, 698 (C.P. 1813) (`[I]t is now well acknowledged in all the Courts of Westminster-hall, that whether in actions for criminal conversation, malicious prosecutions, words, or any other matter, if the damages are clearly too large, the Courts will send the inquiry to another jury.') (emphasis in original).
11 "In his opinion in [Gore], 517 U.S. at ___, 116 S.Ct. at 1606, Justice Breyer, speaking for three members of the five-member majority, criticized this Court's application of the Green Oil factors.
12 "I note that the three due process guideposts (i.e., reprehensibility of the wrongful conduct, ratio of punitive damages to compensatory damages, and comparable civil and criminal penalties) are similar to the three protective Green Oil factors (i.e., reprehensibility of the wrongful conduct, reasonable relationship of the size of the punitive award to the actual and probable harm, and mitigation for actual civil and criminal penalties imposed). This is because the guideposts and the protective Green Oil factors protect similar interests. The three guideposts protect the defendant's due process right to receive fair notice of the severity of potential penalties against him, 517 U.S. at ___, 116 S.Ct. at 1598, and the three Green Oil factors protect the defendant from unreasonable punitive awards imposed by an impassioned or prejudiced jury, Green Oil, 539 So.2d at 222.
13 "The principle that punitive damages should bear a reasonable relationship to compensatory damages has roots going back to the early English statutes that provided for punitive damages equal to a multiple of actual damages. See David G. Owen, A Punitive Damages Overview: Functions, Problems and Reform, 39 Vill. L.Rev. 363, 368 & n. 23 (1994). Alabama courts have consistently upheld the reasonable relationship principle. See Mobile & Montgomery R.R. v. Ashcraft, 48 Ala. 15, 33 (1872) (`punitive damages ought ... to bear proportion to the actual damages sustained`). (Emphasis added.) Such authorities plainly suggest that a reasonable ratio between punitive damages and actual damages is a hallmark of common law reasonableness.
14 "Ala. Code 1975, § 8-19-10(a)(2) (providing for treble damages for certain violations of the Deceptive Trade Practices Act); § 37-2-18 (providing treble damages for certain harm caused by common carriers); § 10-2B-15.02 (levying a penalty `equal to treble the amount of all fees and taxes' on foreign corporations that fail to obtain a certificate of authority); 18 U.S.C. § 1964(c) (providing for treble damages for civil violations of the Racketeer Influenced and Corrupt Organizations Act); 15 U.S.C. § 15 (providing for treble damages for violations of the Sherman Act's prohibition on monopolistic practices).
"....
15 "I would require further indicia of egregious conduct to justify a sizable punitive award when physical safety or health is not endangered. In Green Oil, 539 So.2d at 223, this Court stated:
"`The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or `cover-up' of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.'
16 "In Green Oil, 539 So.2d at 223-24, this Court stated:
"`If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.
"`....
"`... If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award.'
"(Quoting Aetna [Life Ins. Co. v. Lavoie], 505 So.2d [1050,] 1062 [(Ala.1987)].)"

APPLICATION OF THE ANALYSIS TO LIFE INSURANCE COMPANY OF GEORGIA v. JOHNSON
I would apply the strict state law reasonableness standard to this case as follows: First, because the trial judge placed sufficient facts and analysis in the record to permit appellate review of the reasonableness of the punitive damages award, remand is not necessary.[12] Second, I would apply an exacting review to each of the Green Oil factors, including the reinvigorated protective factors. In this case, the defendant Life of Georgia sold Daisey Johnson, a poor and elderly woman, a Medicare supplement policy that, because she was already eligible for Medicaid, provided her no net benefits. Johnson I, 684 So.2d at 687. Johnson introduced evidence that tended to show that Life Insurance Company of Georgia ("Life of *541 Georgia") knew she was on Medicaid but purposely misrepresented that she needed the Medicare supplement policy to pay her hospital bills if she became ill. Id. at 688. Johnson purchased the supplement policy and made premium payments for almost three years. Id. After learning that the policy was worthless to her, she brought fraud and suppression claims against Life of Georgia. Id. at 687.
1. Ratio of Punitive Damages to Compensatory DamagesIn this case, the jury awarded $15,000,000 in punitive damages and $250,000 in compensatory damages. Id. at 687. This far exceeds the three-to-one benchmark. Accordingly, the record must demonstrate clear and specific justification.
2. ReprehensibilityAlthough Life of Georgia's actions did not endanger the physical health or safety of Johnson or others, its conduct reflects infliction of economic and emotional harm on a vulnerable victim, resulting from an affirmative misrepresentation, coupled with repeated conduct after a prior punishment. Id. at 688-90. See Johnson I, 684 So.2d at 689 (noting that after suffering an adverse verdict in 1992 for selling Medicare supplement policies to unqualified persons, Life of Georgia continued its fraudulent practices through June 1994); Foster v. Life Ins. Co. of Georgia, 656 So.2d 333 (Ala.1994) (approving a $1,000,000 punitive award for the same course of conduct). Daisey Johnson was an 87-year-old uneducated, black woman without a husband. She spent almost a third of her fixed income over a three-year period to pay for a worthless policy. Johnson I, 684 So.2d at 688-89. The trial court found that Life of Georgia marketed such worthless policies to other similarly vulnerable victims. Id. at 689. Thus, a ratio of greater than 3:1 punitive damages to actual harm is appropriate. I consider as compelling, among other facts, the vulnerability of the poor and elderly victims, the major financial concern that health insurance poses for them, and Life of Georgia's continued sale of the worthless policies to these vulnerable victims even after receiving an adverse verdict in another case for similar wrongdoing. Id. at 689-90. In light of the particular egregious facts of this case, I would hold that Life of Georgia's conduct was reprehensible enough to justify a punitive award of up to five times the compensatory damages, or $1,250,000.
3. Similar Civil and Criminal SanctionsAla. Code 1975, § 27-1-12, imposes a $1,000 fine, up to one year of imprisonment, or both, for each willful violation of the Alabama Insurance Code. Because the record does not reflect a multitude of violations by Life of Georgia, the possible criminal fine would probably be well below $1,250,000. Therefore, this factor supports the reduction of the punitive award below a five-to-one ratio.[13]
4. Profitability of ConductJohnson paid a total of $3,132 in premiums to Life of Georgia with respect to the Medicare supplement policy. Johnson I, 684 So.2d at 688. A punitive damages award of $1,000,000 to $1,250,000 would more than remove the profit earned by Life of Georgia on the $3,132 it received from Johnson. See Green Oil, 539 So.2d at 223.
5. Financial Position of the Defendant Life of Georgia's financial reports indicate that in 1993 it earned over $173 million in investment income. Johnson I, 684 So.2d at 691. With this level of investment income, a punitive award of $1,250,000 would sufficiently punish the company without financially devastating it. See Green Oil, 539 So.2d at 223.
6. Costs of LitigationThe plaintiff's attorneys tried the case to a jury and did a thorough job of handling the direct appeal and application for rehearing in this Court. *542 Johnson I, 684 So.2d 685 passim. There was no evidence of abuse of the legal process. Given the particular facts of this case, a punitive damages award of $1,250,000 should be ample.[14] See Green Oil, 539 So.2d at 223.
I conclude that a punitive damages award of $1,250,000 would be reasonable in this case.[15] I would, therefore, affirm the judgment of the trial court, conditioned on the plaintiff's filing a remittitur of all punitive damages in excess of that amount.
HOOPER, C.J., and MADDOX, J., concur.
NOTES
[1] Section 6-11-23(b) requires a trial judge to conduct a hearing or to receive additional evidence, or both, concerning an award of punitive damages, upon motion of either party. Admissible evidence includes evidence indicating whether the defendant has been guilty of the same or similar acts in the past, evidence indicating the nature and extent of any effort the defendant made to remedy the wrong, and evidence indicating the opportunity or lack of opportunity the plaintiff gave the defendant to remedy the wrong complained of.
[2] In addition, the United States Supreme Court stated that in order to avoid encroachment on the policy choices of other States, "the economic penalties that a State such as Alabama inflicts on those who transgress its laws, whether the penalties take the form of legislatively authorized fines or judicially imposed punitive damages, must be supported by the State's interest in protecting its own consumers and its own economy." 517 U.S. at ___, 116 S.Ct. at 1597. Life of Georgia now attempts to argue that the closing argument of counsel for the plaintiff was improperly based upon speculation concerning out-of-state conduct. There was no objection to the closing argument made at the time; therefore, there is nothing to review.
[3] Ala. Acts 1915, Act No. 542, now codified at § 12-22-71, Ala.Code 1975 (statute held constitutional in Alabama Power Co. v. Talmadge, 207 Ala. 86, 93 So. 548 (1921)).
[4] The parenthetical expression appearing in the last sentence of subsection (b) has been held unconstitutional. Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d 414 (Ala.1991).
[5] We note the obvious, however. Corporations cannot be put in jail, and a corporation acts only through its agents. Alabama's policy of protecting its citizens from fraud would hardly be advanced by prosecuting debit agents for theft. It goes without saying that the only way to punish a corporation is by way of a monetary award.
[*] Note from the reporter of decisions: On September 3, 1997, the Supreme Court issued a "certificate of judgment of affirmance," noting that "the appellee, Daisey L. Johnson, did on August 20, 1997, file in this Court a remittitur reducing the punitive damages to $3,000,000." The certificate stated "IT IS NOW CONSIDERED, ORDERED AND ADJUDGED that the judgment of the circuit court for punitive damages be reduced to $3,000,000 and, as thus reduced, the judgment of the circuit court is hereby affirmed, with interest and costs. IT IS FURTHER ORDERED AND ADJUDGED that the appellant, Life Insurance Company of Georgia, pay the costs of appeal and the costs taxed against the defendant in the court below will stand as taxed."
[6] See Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 42, 111 S.Ct. 1032, 1056, 113 L.Ed.2d 1 (1991) (O'Connor, J., dissenting). I suggested in Charter Hospital of Mobile v. Weinberg, 558 So.2d 909, 917 (Ala.1990) (Houston, J., concurring specially), that we follow the recommendation of the American College of Trial Lawyers, "Report on Punitive Damages of the Committee on Special Problems in the Administration of Justice" (March 3, 1989), pp. 18-19.
[7] Compare, e.g., 1 William Blackstone, Commentaries *46 (describing the Roman emperor Caligula's unjust practice of writing his laws in small characters and hanging them on high pillars, thereby facilitating arbitrary enforcement) with J.B. Bury, A History of Greece 179 (Modern Lib. ed.1937) (describing the Greek lawgiver Solon's just practice of inscribing his laws on wooden tables and placing them on revolving stands in the Public Hall of Athens, thereby facilitating consistent enforcement).
[8] As Justice Holmes stated:

"People want to know under what circumstances and how far they will run the risk of coming against what is so much stronger than themselves [i.e., public enforcement of judicial decrees], and hence it becomes a business to find out when this danger is to be feared. The object of our study, then, is prediction, the prediction of the incidence of public force through the instrumentality of the courts."
Oliver Wendell Holmes, Jr., The Path of the Law, in Collected Legal Papers 167, 167 (Legal Classics Lib. ed.1982).
[9] A majority of this Court has also rejected the Legislature's attempt to provide predictability. Compare Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993) (holding that a statute limiting punitive awards violated the Alabama Constitution) with BMW of North America, Inc. v. Gore, 517 U.S. 559, ___, 116 S.Ct. 1589, 1608-09, 134 L.Ed.2d 809 (1996) (Breyer, J., concurring) (citing favorably Texas, Connecticut, Florida, and Georgia statutes that limit punitive damages awards).
[10] Indeed, the majority's application of the Supreme Court's three-factor constraint on punitive damages would permit avoidance of the Supreme Court's limit on punitive damages through the filing of numerous separate actions against a defendant in the place of the filing of a single class action. The majority indicates that a $3 million punitive award is justified to some degree on the basis of the defendant's harm to other insureds. Yet, the majority refuses to tie the punitive award to any particular ratio of punitive to compensatory damages. See generally Bruce J. McKee, The Implications of BMW v. Gore for Future Punitive Damages Litigation: Observations from a Participant, 48 Ala. L.Rev. 175 (Fall 1996) (noting that if punitive damages are tied to a given ratio of compensatory damages, then plaintiffs' lawyers will file class actions to facilitate efficient litigation in light of an aggregate limit on damages); id. at n. 371 (stating that a motion for class action certification in a case similar to BMW I had been filed as of October 12, 1996). Thus, while ostensibly approving the imposition of a $3 million punishment on Life of Georgia, the majority, in light of Foster v. Life Ins. Co. of Georgia, 656 So.2d 333 (Ala.1994) (approving $1 million punitive award for the same course of conduct as that punished in this case), has in fact approved at least a $4 million punishment. The majority's application invites still other punitive awards that do not, in and of themselves, violate the "outer limit" of federal due process. With 116,000 potential plaintiffs, Life of Georgia could well be exposed to an aggregate punitive liability of many multiples of the $3 million punitive award approved in this case.
[11] The way the majority applies the constitutional standard introduces into that standard the same defect that ultimately rendered the Green Oil factors ineffective and produced the verdict in BMW. See BMW, 517 U.S. at ___ ___, 116 S.Ct. at 1606-07 (Breyer, J., concurring) ("Alabama courts ... have applied the `factors' intended to constrain punitive damages awards ... in a way that belies that purpose.").
[12] In Hammond, 493 So.2d at 1379, this Court required "trial courts to reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages." I reiterate the necessity for trial courts to examine with specificity each of the Green Oil factors in light of the evidence at trial and to reflect in the record how the final punitive award was determined.
[13] Because the 5:1 ratio I would adopt in this case would serve to limit aggregate punitive damages, a reduction for the $1,000,000 civil sanction in Foster v. Life Ins. Co. of Georgia, 656 So.2d 333 (Ala.1994), is not required. Of course, special circumstances could require a further reduction. The majority, however, sets no limit on the overall aggregate award against Life of Georgia. Instead, the majority merely states that the $1,000,000 award in Foster is "to be taken in mitigation," without detailing how the mitigation impacts the aggregate punitive award against Life of Georgia. 701 So.2d at 534.
[14] In certain cases involving small amounts of actual damages, it may be necessary to give relatively more weight to costs of litigation, in order to ease the burden of plaintiffs with special financial needs. Properly constrained, this principle should not promote unreasonable punitive awards. See BMW, 517 U.S. at ___, 116 S.Ct. at 1607 (Breyer, J., concurring); see also Continental Trend Resources, Inc. v. OXY USA Inc., 101 F.3d 634, 642 (10th Cir.1996), cert. denied, ___ U.S. ___, 117 S.Ct. 1846, 137 L.Ed.2d 1049 (1997) (stating that considering litigation costs in setting punitive damages awards may tend to prevent a "rich defendant" from forcing or prolonging litigation where the plaintiff cannot bear the costs of the delay).
[15] See generally, e.g., North Carolina Mut. Life Ins. Co. v. Holley, 533 So.2d 497 (Ala.1987) (requiring remittitur to $500,000 from a $1,000,000 punitive award where insurance company knowingly sold policy to cancer victim who did not qualify for coverage, and, upon her death, refused payment); National States Ins. Co. v. Jones, 393 So.2d 1361 (Ala.1980) (upholding remittitur to $500,000 from a $3,500,000 punitive award where insurance company fraudulently induced a woman to purchase various health policies and then canceled coverage based on allegedly incorrect application); see also Haslip, 499 U.S. at 2, 7 n. 2, 23, 111 S.Ct. at 1035-36, 1037 n. 2, 1046 (stating that an $840,000 punitive award for fraud in misappropriating premiums paid for health insurance was "close to the line" of constitutional excessiveness); Lee v. Edwards, 101 F.3d 805 (2d Cir.1996) (applying BMW guideposts to require remittitur to $75,000 from a $200,000 punitive award against police officer for malicious prosecution of a drunken driver for assault and resisting arrest).

Alabama trial court data compiled by the Administrative Office of Courts for the 1993, 1994, and 1995 fiscal years (the 1994 data include this case) show:

 FY'93 FY'94 FY'95
Total punitive damages awards $22,056,530 $140,452,942 $80,132,880
Total compensatory awards in cases in 18,591,232 14,430,227 16,548,514
which punitive damages were awarded
Range of punitive 1,000 to 1 to 1,500 to
awards 5,000,000 50,000,000 12,000,000
Median award 35,000 40,000 50,000
Ratio of punitive awards to compensatory
awards 1.2:1 9.7:1 4.8:1
Caseload Statistics on the Disposition of Civil Cases in Alabama (Administrative Office of Courts, Fiscal
Year 1993); id. (Fiscal Year 1994); id. (Fiscal Year 1995).