Mattie Foster sued Life Insurance Company of Georgia (hereinafter "Life of Georgia") and its agents Gary Pickard and Eric Peek, alleging fraud, wantonness, and breach of fiduciary duty. The trial court dismissed Pickard and Peek as defendants upon a joint motion of the parties; it directed a verdict on the wantonness count in favor of Life of Georgia; and Foster voluntarily dismissed her breach of fiduciary duty count. Life of Georgia argued that the fraud claim was barred by the statute of limitations, and the trial court directed a verdict sua sponte for Foster on this issue. The jury returned a verdict in favor of Foster on the fraud count, assessing compensatory damages at $250,000 and punitive damages at $1,000,000. The trial court entered a $1,250,000 judgment pursuant to that verdict. Life of Georgia moved for a new trial or a remittitur of damages pursuant to Hammond v. City ofGadsden, 493 So.2d 1374 (Ala. 1986). Following a hearing, the trial court denied the motion for new trial, but reduced the punitive damages award to $250,000, pursuant to Ala. Code 1975, § 6-11-21. Foster appeals from the judgment based on the reduction of punitive damages, and Life of Georgia cross-appeals from the denial of its motion for new trial or remittitur of compensatory damages.
Mattie Foster, an elderly woman, lives alone in Grove Hill. Although she was unable at trial to remember her exact age, she was between 70 and 72 years old and is illiterate. She had worked as a maid and as a cook for various businesses and individuals earlier in her life.
In 1986, Foster no longer worked and her sole source of income was her monthly Social Security check of approximately $400. That year, a Life of Georgia agent visited Foster in her home and advised her to purchase a life insurance policy on herself and her daughter; Foster did so and eventually purchased five different types of policies from Life of Georgia. A Life of Georgia agent personally collected the premiums for these policies from her once a month, usually on the same day she received her Social Security check.
In 1987, Life of Georgia agent Gary Pickard visited Foster to collect her monthly premiums. Foster mentioned some doctor bills and hospital bills that she was having to pay. According to Pickard, Foster told him that she was covered by Medicare; actually she was covered by Medicaid and was thus not eligible for Medicare. Pickard told Foster that Life of Georgia had a Medicare supplemental policy that she should buy to help her pay her medical bills. He gave her a brochure outlining the policy and explained some of the points of the brochure to her. Foster stated that she wanted to think about buying the policy and would talk it over with her children.
When Pickard came by the next month to collect Foster's premiums, he asked Foster if she had discussed the Medicare policy with the children, and he learned that she had not. He left behind a second brochure, after again explaining the benefits of the policy.
The next month, Pickard came to collect Foster's premium payments and was accompanied by his supervisor, Eric Peek. Peek was monitoring Pickard's job performance to ensure that he measured up to Life of Georgia standards. During that visit, Pickard asked Foster if she had discussed the Medicare supplement policy with her children; Foster said that she had not, but that she wanted to buy the policy. Pickard began filling out a policy application for her and asked to see her "insurance" card. According to Pickard's testimony, Foster searched her home and eventually gave him her white Social Security card; Foster testified, however, that she gave him her blue Medicaid card. It is uncontroverted that both Pickard and Peek knew that the Medicare supplement policy was invalid unless Foster had underlying Medicare coverage. *Page 335 
The Medicare supplement policy application specifically asked whether Foster was covered by Medicaid and whether she was covered by Medicare parts A and B. Pickard wrote on the application that Foster was not covered by Medicaid and that she was covered by both parts of Medicare. An individual's Medicare number is his or her Social Security number, preceded by a letter of the alphabet to signify the type of Medicare coverage the insured has. On Foster's application, Pickard wrote in her Social Security number, with a designation of "A," indicating that Foster's Medicare benefits were in her own name and not in a spouse's name. Pickard based this designation on his own assessment of her situation. Pickard and Peek testified at trial that they never knew Foster was illiterate; however, both observed that Foster marked the policy application with an "X" on the signature line because she could not write her name. Foster then paid $46.24 to Pickard for the policy premium. Pickard left behind a brochure, which stated that the policy required the insured to have underlying Medicare coverage.
Pickard delivered the policy to Foster the next month and explained portions of it to her. He told her that the policy was a guaranteed renewable policy that could not be canceled because of health problems, that she had a 30-day period in which she could examine the policy and cancel it if she wished, and that the policy contained a preexisting conditions clause. He also explained the benefits the policy would pay; however, he did not explain that she would not be eligible for these benefits because she had no underlying Medicare coverage, nor did the policy state this fact on its face. Foster paid increasing premiums on this policy for the next 49 months. As of March 1991, Foster was paying $85 per month in premiums for the Medicare supplement policy, along with an additional $44.90 for her other Life of Georgia policies, out of her monthly $420 Social Security check.
In April 1990, Foster incurred some medical bills, which her doctor submitted to Life of Georgia for payment under the Medicare supplement policy. Life of Georgia returned the bills to Foster's doctor, informing him that it could not pay them until they were first submitted to Medicare, because the policy was a Medicare supplement. A Life of Georgia agent, Barbara Holt, told Foster that the company was investigating her claim; however, the bills were never paid.
In March 1991, Foster, accompanied by her daughter Sedora, consulted a doctor in Mobile. When the doctor's office clerk requested payment, Foster first offered her Medicaid card, which was refused because the office did not accept Medicaid. Foster then presented her Life of Georgia Medicare Supplement policy card. The doctor's clerk looked at it and explained to Foster that the insurance was worthless, because she had Medicaid coverage and was thus not eligible for benefits under a Medicare supplement policy. Sedora paid the bill. Sedora telephoned Barbara Holt that day and got Peek's number, and then she telephoned him at his office in Pensacola, Florida, to tell him what had happened at the doctor's office in Mobile. Peek promised to look into the matter, but never did so.
When a Life of Georgia agent came to Foster's home the next month to collect the premiums for her policies, Foster telephoned her son Chris to come over and talk with him. Chris demanded to know why Life of Georgia would not pay his mother's medical bills, and got no response from the agent. Chris then stated that if Life of Georgia did not pay the bills, his mother would cancel all her policies. Foster ultimately declined to file a claim for the bills and canceled the policies. She then filed this action.
For the sake of clarity, we will first address Life of Georgia's arguments on its cross-appeal. The initial question is whether the trial court erred in directing a verdict sua sponte for Foster on the statute of limitations issue. The statutory period of limitations for a fraud claim is two years, but the two-year period does not begin running until the plaintiff discovered the fraud or, acting as a reasonable person, should have discovered it. Hicks v. Globe Life Accident Insurance Co., 584 So.2d 458 (Ala. 1991). Ordinarily, the question of when a plaintiff discovered or should have discovered an alleged fraud is a question for the jury; however, the issue *Page 336 
may be decided as a matter of law where the plaintiff actually knew of facts that would have put a reasonable person on notice of fraud. Hicks.
In this case, the trial court determined as a matter of law that Foster discovered the fraud in 1991, when the doctor's clerk in Mobile informed her that her insurance was invalid. Life of Georgia argues that there is evidence to establish that Foster should have discovered the alleged fraud between October 1987, when Pickard first told her about the policy, and February 1988, when the policy was delivered to her. Life of Georgia points out upon his October and November 1987 visits to Foster, Pickard left with Foster brochures that, if she had read them, would have informed her that the Medicare supplement policy was invalid because she did not have underlying Medicare coverage. Life of Georgia likewise argues that the application given to Foster in January 1988 and the policy she received the next month should have piqued her suspicion.
The record clearly shows, however, that the brochure, application, and policy documents could not have put Foster on notice of fraud because she was illiterate and thus incapable of reading them. Life of Georgia argues that Foster could have shown the documents to her son and daughter, who were not illiterate, and might have discussed the policy with them. The record shows that Foster sometimes discussed her affairs with her children and that she indicated to Pickard that she was going to discuss the Medicare supplement policy with them; however, Foster and her daughter and son testified that they never discussed the policy until after Foster's 1991 visit to the doctor in Mobile. Pickard himself testified that Foster informed him during his November 1987 and January 1988 visits to her home that she had not discussed the policy with her children. Life of Georgia claims that the evidence shows that Pickard explained the brochure fully to Foster during these visits; however, Pickard himself testified that he discussed the brochure with her only in general terms because, he said, a more detailed explanation tended to "confuse" policyholders. The record does not contain a copy of the brochure as it existed in 1988, so it is impossible to determine whether either a perusal of the brochure or Pickard's explanation of it would have indicated to Foster that she was ineligible to receive benefits under the policy. Nothing on the face of either the application or the issued policy indicates that the policy was worthless to Medicaid recipients; thus, these documents would not have given notice of the alleged fraud even if Foster or her children had read them.
In reviewing a directed verdict, this Court must determine whether there was sufficient evidence to produce a conflict warranting jury consideration. Ogle v. Long, 551 So.2d 914
(Ala. 1989). The evidence is not sufficient to create a jury question as to whether Foster knew or should have known of the alleged fraud before 1991. The trial court, therefore, properly directed a verdict on the statute of limitations issue.
Life of Georgia next argues that the jury's $250,000 compensatory damages award was excessive and should have been remitted. Upon review of a jury verdict, we presume that the verdict was correct, we review the tendencies of the evidence most favorably to the prevailing party, and we indulge such reasonable inferences as the jury was free to draw from the evidence. King v. W.A. Brown Sons, Inc., 585 So.2d 10 (Ala. 1991). This Court will not overturn a jury verdict unless it is so contrary to the evidence as to be clearly wrong and unjust.King.
Life of Georgia argues that Foster did not present adequate testimony of mental anguish and emotional distress to justify a $250,000 compensatory damages award. The record shows that Foster paid $2,468.60 in policy premiums and the $95 medical bill from her doctor in Mobile. The remaining amount of compensatory damages must therefore be attributed to the mental anguish and emotional distress Foster suffered because of Life of Georgia's actions. The testimony concerning her suffering was limited to the following exchange between Foster and her attorney at trial:
"How has this affected you, Mattie?
"It's affected me a lot.
". . . .
 "It's affected me a lot. After I found out the insurance was not no good and how much money I put in it when I could have *Page 337 
been doing something else with it. And they really put the pressure on me."
Foster further testified that her distress did not begin until after she discovered that the policy was worthless and that she sued approximately two months after this discovery. In its order issued after the Hammond hearing, the trial court noted that Foster's testimony as to pain and suffering was minimal; nevertheless, the trial court conceded that the jury was authorized under Alabama law to award compensatory damages for mental anguish and emotional distress if it found that Life of Georgia had intentionally perpetuated a fraud on Foster.
We recognize that mental anguish and emotional distress are not items for which a precise amount of damages can be assessed; thus, in considering whether a jury verdict for compensatory damages is excessive, we must view the evidence from the plaintiff's perspective and determine what the evidence supports in terms of the plaintiff's suffering.Pitt v. Century II, Inc., 631 So.2d 235 (Ala. 1993). In this case, the only evidence regarding Foster's mental anguish and emotional distress is her bare assertion that the discovery of fraud affected her "a lot" and that she sued two months after the mental anguish and emotional distress began. From this limited evidence, we agree that the jury could infer that Foster suffered some measure of mental anguish and emotional distress from the realization that she had been paying over a fifth of her monthly income to an insurance company for a worthless policy; however, we hold that, even when viewed in a light most favorable to her, Foster's scant testimony of mental anguish and emotional distress, without more, does not support an award exceeding $120,000 for each of the two months before she sued. We conclude that the $250,000 compensatory damages award was excessive by $200,000.
We now address the single issue raised in Foster's appeal. Foster argues that the $1,000,000 punitive damages verdict is supported by the evidence and should be reinstated. The trial court stated in its Hammond order that the reduction was based solely on Ala. Code 1975, § 6-11-21, which placed a $250,000 cap on the punitive damages that could be awarded in this case. The court held that the $1,000,000 verdict was substantiated by the evidence and should be reinstated in the event that this Court struck down § 6-11-21 as unconstitutional. During the pendency of this appeal, this Court held § 6-11-21 unconstitutional as violating the right to a jury trial under § 11. Ala. Const. 1901. Henderson v. Alabama Power Co., 627 So.2d 878 (Ala. 1993). Based on Henderson and the evidence supporting the verdict, we hold that the $1,000,000 verdict is due to be reinstated. That portion of the judgment awarding $250,000 in punitive damages is set aside and a judgment of $1,000,000 in punitive damages is rendered for the plaintiff, based on the jury's verdict. That portion of the judgment awarding compensatory damages is affirmed, conditioned upon the plaintiff's acceptance of a $200,000 remittitur. If the plaintiff does not, within 30 days after the date of this opinion, file a remittitur reducing the compensatory damages award to $50,000, the judgment shall be reversed and the cause remanded for a new trial. See Ala. Code 1975, § 12-22-71.
AWARD OF PUNITIVE DAMAGES SET ASIDE AND JUDGMENT RENDERED CONDITIONALLY AS TO PUNITIVE DAMAGES; AWARD OF COMPENSATORY DAMAGES AFFIRMED CONDITIONALLY.
HORNSBY, C.J., and ALMON, SHORES, HOUSTON, KENNEDY, INGRAM and COOK, JJ., concur.