738 So.2d 824 (1999)
DELCHAMPS, INC.
v.
James Sterling BRYANT.
1971502.
Supreme Court of Alabama.
April 23, 1999.
*827 Davis Carr, Frank L. Parker, Jr., and Kathleen Cobb Kaufman of Carr, Alford, Clausen & McDonald, L.L.C., Mobile, for appellant.
James E. Harris, Birmingham; and William K. Bradford, Birmingham, for appellee.
LYONS, Justice.
James Sterling Bryant (hereinafter "J. S. Bryant") sued Delchamps, Inc., alleging malicious prosecution arising from a case of mistaken identity and continued prosecution after notice of a potentially unassailable alibi. After a mistrial, based on the jury's being unable to agree as to the amount of damages, the jury in a second trial returned a verdict in favor of J.S. Bryant and awarded him compensatory damages in the amount of $400,000. J.S. Bryant did not seek punitive damages. The trial court denied Delchamps's post-judgment motion for a judgment as a matter *828 of law ("JML"),[1] a new trial, or a remittitur of damages. Delchamps appeals from the trial court's denial of its postjudgment motion. We affirm conditionally.

I.
The evidence presented during the second trial suggests the following facts.
On December 31, 1991, Charles Holloway and James Robert Bryant ("J. R. Bryant"), who is not one and the same as J.S. Bryant, entered a Delchamps grocery store in Birmingham. The assistant store manager, Stephen Scott, testified that he saw J.R. Bryant pick up two cartons of cigarettes and take them to Holloway, who, Scott said, had walked to the back of the store. Scott heard the alarm on the cigarette counter beeping and told two co-workers to keep an eye on the two men. One of the co-workers stated that he saw Holloway place both cartons in the back of his pants. Scott then went to the front of the store to question the two men about the cigarettes; however, both of them were permitted to leave. The two men got into a Chevrolet Celebrity automobile driven by a third man. As they drove away, one of the Delchamps employees wrote down the automobile's license-plate number.
Scott then telephoned the Jefferson County Sheriffs Department to report the shoplifting incident. That same night, he completed a "Uniform Incident/Offense Report," giving an account of the events, a description of the two suspects, and the license-plate number of the automobile. The sheriff's department learned that the automobile was registered to Dorothy Holloway and James Kimberly.
A few days later, a deputy sheriff drove to the Holloway address provided by the report generated from an inquiry based on the license-plate number and spoke with Charles Holloway's wife. The deputy left a message asking that Mr. Holloway telephone him the next day. Holloway complied, and in talking with the deputy he admitted to having been in the Delchamps store on the night of the incident, with J.R. Bryant and J.R. Bryant's son, Jamey. Holloway stated that at the Delchamps store he lent J.R. Bryant $20 to buy cigarettes, that he did not recall any theft, and that he could not be sure whether J.R. Bryant had stolen anything.
The next day, two deputy sheriffs met with the two Delchamps employees who had been alerted by Scott to keep an eye on Holloway and J.R. Bryant. One of the deputies had obtained the name "James Bryant" from earlier interviews with the Delchamps employees. The sheriff's department created a photographic lineup; the lineup included a picture of J.S. Bryant because his name matched that obtained from the Delchamps employees and because he had a criminal record reflecting a conviction for sodomy. Both Delchamps employees viewed the photographic lineup and immediately identified Holloway. As to the other suspect, one of the employees narrowed the choice to two other pictures, one of which was a picture of J.S. Bryant. The other employee picked the picture of J.S. Bryant immediately. On the following day, the two sheriff's deputies returned to the Delchamps store to meet with Scott and show him the photographic lineup. Within seconds, Scott indicated that he identified both Holloway and J.S. Bryant. Scott reported that he had looked at the video monitor and had seen the person now known to be J.R. Bryant pick up the cigarettes and walk away hurriedly. Scott also said that he had confronted that suspect before he left the store. Later that afternoon, the two deputies talked with J.R. Bryant at the trailer park where he lived. Apparently, they did not recognize that the James Bryant to whom they were then speaking was not the same James Bryant whose picture was in the photographic *829 lineup. J.R. Bryant admitted to having been in the Delchamps store on the night of the incident, but denied stealing anything. One of the deputies stated in his incident report that he would have the information he had obtained screened at the district attorney's office and that warrants would be obtained. He marked the case closed and cleared by arrest.
A few days later, a deputy district attorney issued two felony warrants for Holloway and J.S. Bryant. No action was taken by the sheriff's department on the Bryant arrest warrant until the morning of February 23, 1994, when J.S. Bryant was arrested at his parents' home. Despite his protest that the arresting officers had the wrong man, J.S. Bryant was taken to the county jail. He was released later that day after his father had posted bond. When J.S. Bryant's father learned of the time when the offense was alleged to have been committed, he telephoned Delchamps's headquarters and informed a paralegal assistant for Delchamps's corporate counsel that his son could not have committed the crime because on that date, December 31, 1991, his son was incarcerated in the Bullock County Correctional Facility on a conviction of sodomy. Delchamps's corporate counsel then referred the matter to outside counsel for further investigation.
Outside counsel's paralegal assistant met with J.S. Bryant's father to copy his son's prison records. She located and met with the three Delchamps employees who had witnessed the shoplifting incident and had identified J.S. Bryant. She also contacted and met with Edward McGuffie, one of the deputies who had investigated the shoplifting incident. The paralegal stated that McGuffie told her that J.S. Bryant's prison records did not necessarily prove that he was physically in the prison on the date in question because on that date he could have been on a furlough or a pass. Outside counsel also met with some of the potential witnesses. In notes he prepared for a planned meeting with Scott, beside a list labeled "Things to discuss with Stephen Scott," appears the notation "Importance of winning this case!" (Defendant's Exhibit 5.)
The paralegal had no prior experience with a law firm that handled criminal cases, but she recognized that determining whether J.S. Bryant was in prison on the relevant date was the most important question. Nevertheless, she worked on the case for 10 days before attempting to locate the records necessary to determine whether J.S. Bryant had been on a pass or furlough on December 31, 1991. She ascertained that a record at the prison where he had been confined showed that he left the prison for a court appearance on two consecutive days in October 1991, two months before the shoplifting incident, but that the prison had no record of his being away on the date of the shoplifting incident. She learned that the Central Records Office at the Department of Corrections maintained the kind of records necessary to answer the question, but she never requested those records, because, she said, someone in the Central Records Office told her that the records had been purged. Outside counsel then advised Delchamps that he had been unable to determine for certain that J.S. Bryant physically was in prison on the date in question, but that the case should proceed.
The records that had eluded outside counsel's investigation existed, however, and J.S. Bryant's defense attorney located them. The defense attorney testified that he telephoned the Central Records Office, issued a subpoena for the necessary information, and arranged for a witness from the Department of Corrections to be present at J.S. Bryant's preliminary hearing on the shoplifting charge. That witness was prepared to establish that J.S. Bryant had been incarcerated on December 31, 1991. The defense attorney testified that before the preliminary hearing, he telephoned Delchamps's outside counsel and told him, "You guys have got the wrong guy." (R. 109.) Outside counsel, however, denied *830 that he had been contacted by the defense attorney.
The three witnesses from Delchamps attended the preliminary hearing. Before it began, J.S. Bryant's defense attorney told the sheriff's deputies and the district attorney that his witness from the Department of Corrections was prepared to testify that J.S. Bryant had been incarcerated on the date in question. During a break in the hearing, the two deputies returned to the trailer park where they previously had spoken with J.R. Bryant. The manager of the trailer park informed them that J.R. Bryant had moved to Kentucky shortly after their initial conversation with him. The case against J.S. Bryant subsequently was nol-prossed. J.S. Bryant then commenced this action against Delchamps, seeking damages for malicious prosecution.

II.
As previously noted, this case has been tried two times, the first resulting in a mistrial and the second resulting in a jury verdict awarding J.S. Bryant $400,000 in compensatory damages. On this appeal by Delchamps, our review is limited to the testimony and other evidence presented to the jury in the second trial. Accordingly, Delchamps's motion to strike excerpts and facts from the first trial that were included by J.S. Bryant in his brief is granted. The record from the first trial is not a part of the record on appeal presently before this Court.

III.
Delchamps makes seven contentions relating to the trial court's denial of its postjudgment motion:
(1) That Delchamps had probable cause to initiate and to continue the action against J.S. Bryant;
(2) That Delchamps acted without malice in prosecuting J.S. Bryant;
(3) That Delchamps relied upon the advice of counsel in prosecuting J.S. Bryant;
(4) That the trial court erred in granting J.S. Bryant's motion in limine, prohibiting Delchamps from mentioning the crime for which he had been convicted;
(5) That counsel for J.S. Bryant improperly asked a question that suggested similar prior acts of malicious prosecution by Delchamps and that, although the trial court sustained Delchamps's objection, the court erred in not granting Delchamps's motion for a mistrial;
(6) That during summation, counsel for J.S. Bryant improperly published to the jury evidence of an offer of compromise and that, although the trial court sustained Delchamps's objection, the court erred in not granting Delchamps's motion for a mistrial;
(7) That the trial court erred in denying Delchamps's motion for remittitur or a new trial, because, Delchamps says, the jury award was not supported by the evidence.

IV.
When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). For actions filed after June 11, 1987, the nonmovant must present "substantial evidence" in order to withstand a motion for a JML. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the *831 nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala.1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala. 1992).
Furthermore, a jury verdict is presumed to be correct, and that presumption is strengthened by the trial court's denial of a motion for a new trial. Cobb v. MacMillan Bloedel, Inc., 604 So.2d 344 (Ala.1992). In reviewing a jury verdict, an appellate court must consider the evidence in the light most favorable to the prevailing party, and it will set aside the verdict only if it is plainly and palpably wrong. Id.

V.
Delchamps contends that the trial court erred in denying its motions for JML because, it argues, J.S. Bryant failed to present sufficient evidence in support of his claim alleging malicious prosecution. Delchamps's first three contentionsthat it had acted with probable cause, that it had acted with an absence of malice, and that it had acted with advice of counselconstitute grounds in support of this contention and they are discussed together.
Delchamps contends that J.S. Bryant failed to present sufficient evidence regarding his allegations that Delchamps acted without probable cause and with malice for the trial court to submit his claim to the jury. Delchamps maintains that it presented evidence that J.S. Bryant was similar in looks to J.R. Bryant, that sheriffs deputies had identified J.S. Bryant as the shoplifter, that the three Delchamps employees had identified J.S. Bryant as the shoplifter, and that, until the day of the preliminary hearing, the sheriffs department and the district attorney's office had believed they had probable cause to continue the prosecution. We agree that J.S. Bryant offered insufficient evidence for a finding that in instituting the proceeding, Delchamps was guilty of malicious prosecution.
J.S. Bryant contends, however, that the issue in this case is not whether there was a lack of probable cause to arrest him, but whether Delchamps lacked probable cause to go forward with the case, and thus acted with malice, after it learned, or should have learned, that he had been serving a prison sentence at the time of the shoplifting. He maintains that he presented evidence indicating that Delchamps acted wantonly, recklessly, and carelessly in proceeding to have him prosecuted after being faced with evidence indicating that it might not be pursuing the right man and being faced with a lack of any credible alternative explanation. J.S. Bryant responds to Delchamps's assertion of the defense of advice of counsel by challenging the outside counsel's experience in criminal proceedings.
Although Delchamps maintained that the two Bryants were similar in appearance, Scott, soon after the incident, described the suspect as having a full beard and curly hair, but at trial he said the suspect looked like a man who needed a shave and whose hair was merely unkempt rather than curly. The deputy sheriff who prepared the photographic lineup testified that he placed J.S. Bryant's picture in the lineup only because of the similarity in names. J.S. Bryant contends that the picture of him used in the lineup does not resemble a man with a full beard and curly hair.
In order for a claim of malicious prosecution to be submitted to a jury, the trial court must determine that the plaintiff has presented substantial evidence of the following elements: (1) that a prior judicial proceeding was instituted by the present defendant, (2) that in the prior proceeding the present defendant acted without probable cause and with malice, (3) that the prior proceeding ended in favor of *832 the present plaintiff, and (4) that the present plaintiff was damaged as a result of the prior proceeding. Fina Oil & Chemical Co. v. Hood, 621 So.2d 253 (Ala.1993); Delchamps, Inc. v. Larry, 613 So.2d 1235 (Ala.1992). Viewing the evidence in the light most favorable to J.S. Bryant, we conclude that the trial court did not err in submitting the malicious-prosecution claim to the jury; a reasonable jury could have concluded that J.S. Bryant had met his burden of proof.
The first, third, and fourth elements noted above are undisputed. Delchamps contends that J.S. Bryant failed to present substantial evidence of the second element that it lacked probable cause and that it acted with malice in instigating and continuing to pursue the charges against him.
We begin with the general rule that a malicious-prosecution action is disfavored in the law. Cutts v. American United Life Ins. Co., 505 So.2d 1211, 1214 (Ala.1987). We must strike a delicate balance between the competing societal goals of encouraging prosecutions that bring the guilty to justice and discouraging false accusations made without probable cause. Gulsby v. Louisville & N.R.R., 167 Ala. 122, 52 So. 392 (1910). See, also, S.S. Kresge Co. v. Ruby, 348 So.2d 484 (Ala. 1977), wherein this Court stated:
"`Probable cause' as the term is employed in actions for malicious prosecution, is such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty."
348 So.2d at 488 (quoting with approval Birwood Paper Co. v. Damsky, 285 Ala. 127, 134, 229 So.2d 514, 521 (1969)). This Court also has stated:
"`One of the reasons for this rule is that public policy requires that all persons shall resort freely to the courts for redress of wrongs and to enforce their rights, and that this may be done without the peril of a suit for damages in the event of an unfavorable judgment by jury or judge. If this were not the case, a large proportion of unsuccessful civil actions would be followed by suits for malicious prosecution, and there would be a piling of litigation on litigation without end.'"
Delchamps, Inc. v. Morgan, 601 So.2d 442, 445 (Ala.1992) (quoting Liberty Loan Corp. of Gadsden v. Mizell, 410 So.2d 45, 48 (Ala.1982)). Although the Court in Morgan acknowledged the relevance of the subjective belief of the prosecutor, it measured the conduct of the prosecutor in terms of whether there existed "`such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty.'" 601 So.2d at 445 (quoting Birwood Paper, 285 Ala. at 134, 229 So.2d at 521). When the facts regarding the existence of probable cause and the absence of malice are not in dispute, the question presented is an issue of law for the court. Glidden Co. v. Laney, 234 Ala. 475, 175 So. 296 (1937); Dodson v. Ford Motor Credit Co., 46 Ala.App. 387, 243 So.2d 43 (Ala.Civ.App.1971). When disputed facts are presented, the issue of the existence of probable cause and the absence of malice is not a question of law for the trial court. Schwabacher v. Herring, 35 Ala.App. 496, 500, 48 So.2d 574, 577 (1950).
When probable cause exists, proof of the highest degree of malice gains the plaintiff nothing. Gulsby, 167 Ala. at 128-29, 52 So. at 394-95. Yet, when probable cause is shown to be lacking, malice is essential to recovery. Id. The mere fact that the plaintiff was acquitted in the prior action does not establish a want of probable cause. S.S. Kresge Co., 348 So.2d at 488; Piggly-Wiggly Alabama Co. v. Rickles, 212 Ala. 585, 103 So. 860 (1925). Dismissal of the charges against the plaintiff at the preliminary-hearing stage is prima facie evidence only of a want of probable *833 cause, from which a jury may infer malice. Caldwell v. Standard Oil Co., 220 Ala. 227, 124 So. 512 (1929).
Where no other reasonable explanation exists for the conduct of the defendant, malice may be inferred. Johnson v. Smith, 503 So.2d 868, 869 (Ala.Civ. App.1987). But the inference of malice from the lack of probable cause may be rebutted by evidence showing that the defendant acted in good faith. Huffstutler v. Edge, 254 Ala. 102, 47 So.2d 197 (1950); Lunsford v. Dietrich, 93 Ala. 565, 9 So. 308 (1891). Put another way, good faith can preclude a finding of malice on the defendant's part. United States Fidelity & Guaranty Co. v. Miller, 235 Ala. 340, 179 So. 239 (1938).
Another expression of the test for proof of malice comes from Lunsford, where the Court rejected the defendant's contention that proof of malice required evidence of a desire to injure. 93 Ala. at 569, 9 So. at 310. In holding that the existence of any motive other than a bona fide purpose to bring the accused to punishment constitutes malice, the Court stated:
"There need be no personal ill will, hate, desire for revenge, or other base and malignant passion. Whatever is done willfully and purposely, whether the motive be to injure the accused, to gain some advantage to the prosecutor, or through mere wantonness or carelessness, if it be at the same time wrong and unlawful within the knowledge of the actor, is in legal contemplation maliciously done."
Id. (emphasis added). This standard suggests the low threshold for proof of malice, by including in the litany of predicates "wantonness or carelessness" (emphasis added). It also is tied, however, to circumstances where the conduct is "at the same time wrong and unlawful within the knowledge of the actor." Id. Alabama Pattern Jury Instructions: Civil (2d ed. 1993) ("APJI"), Instruction 24.04, preserves the concept that recklessness, standing alone, is not sufficient to allow recovery:[2]
"Malice may be inferred by the reckless institution of a criminal prosecution without information leading to a bonafide belief that the person charged was guilty as claimed."
(Emphasis added.) See, also, United States Fidelity & Guaranty, 235 Ala. at 342, 179 So. at 241, holding that a reckless act taken by one without information leading to a bona fide belief justifies a finding of an absence of probable cause, from which malice can be inferred.
The record contains no evidence indicating that, when Delchamps acted on outside counsel's advice to proceed with the prosecution, it was aware of the existence of records that would prove that J.S. Bryant was not away from prison on a pass or furlough at the time of the shoplifting incident. To the contrary, J.S. Bryant takes Delchamps to task for not being as thorough as he was, because his defense counsel found the documents that established he was incarcerated on the date in question. That aspect of the rule in cases such as Delchamps, Inc. v. Larry, 613 So.2d at 1235, and S.S. Kresge Co., 348 So.2d at 488 (referring to mere carelessness as a permissible basis for proof of malice) is therefore not applicable, for want of proof that Delchamps then knew its conduct was "wrong and unlawful." Lunsford, 93 Ala. at 569, 9 So. at 310.
Simple negligence alone, therefore, may underlie a decision to institute a proceeding that later is shown to suffer from a want of probable cause, but an inference of malice cannot be drawn solely from such negligence, because the good faith of the actor under such circumstances can constitute a defense. This Court, consistent with the foregoing analysis of the *834 requirement of proof of more than simple negligence in actions alleging malicious prosecution, has declined to permit actions against municipalities alleging malicious prosecution because the liability is not within the traditional categories of "neglect, carelessness or unskillfulness" appropriate for such actions. See Scott v. City of Mountain Brook, 602 So.2d 893, 894 (Ala.1992). Were it otherwise, the tort would be called "negligent prosecution." Bahakel v. City of Birmingham, 427 So.2d 143 (Ala.1983), overruled on other grounds, Franklin v. City of Huntsville, 670 So.2d 848 (Ala.1995). However, going forward carelessly or recklessly with previously commenced proceedings after receiving notice of a problem may be inconsistent with good faith. Glidden Co. v. Laney, 234 Ala. at 475, 175 So. at 296 ("Glidden I"), and Laney v. Glidden Co., 239 Ala. 396, 194 So. 849 (1940) ("Glidden II"), illustrate these points.
Glidden I dealt with whether commencing a proceeding against a party sued by mistake was actionable, while Glidden II dealt with whether going forward with the proceeding against that party after learning of the mistake was actionable. In Glidden I, an attorney brought an action against the wrong party under circumstances where he had no basis to know that there were two people with similar names. His failure to appreciate that fact before commencing the action was found to be a "natural mistake" insufficient to support an action based on a prosecution alleged to be wrongful, malicious, and without probable cause. 234 Ala. at 479, 175 So. at 299. The Court stated that "[m]ere negligence in this respect" on the part of the attorney was insufficient. Id. (emphasis added). The phrase "in this respect" ties the absence of negligence in Glidden I to the surrounding context in which the attorney had acted in good faith. Such a result is consistent with cases where the honest belief of a reasonable person justified the action even though he was wrong. See, e.g., Fina Oil, 621 So.2d at 256-57; Montgomery v. City of Montgomery, 732 So.2d 305 (Ala.Civ.App.1999). It also is consistent with cases where the existence of good faith rebuts an inference of malice. See, e.g., United States Fidelity & Guaranty, 235 Ala. at 342, 179 So. at 240-41.
The same parties returned to this Court in Glidden II after the trial court sustained demurrers to a complaint charging malicious prosecution in the continuation of the action after the plaintiff learned of the mistake. In Glidden II, this Court reversed the ruling of the trial court, holding that the allegation that an action was negligently brought, but wrongfully, intentionally, maliciously, and without probable cause maintained after the plaintiff learned of the mistake, stated a claim for malicious prosecution. On the other hand, when a case of mistaken identity is discovered and the error is corrected by striking the improperly sued party, there is no inference of malice. Dillon v. Nix, 55 Ala.App. 611, 318 So.2d 308 (Ala.Civ.App.1975).
Delchamps asserts the advice of counsel as a complete defense that precludes submitting the claim to the jury. After denying Delchamps's motions for JML during the course of the trial, thereby making the issue of its reliance on the advice of counsel a question for the jury, the trial court charged the jury:
"If you are reasonably satisfied from the evidence that before commencing with the proceedings and continuing with it complained of in this case [sic], the defendant obtained advice of a competent lawyer and did fully inform this lawyer of all the material facts of the case and in reliance on the advice of this lawyer, instituted a legal [action] and continued legal action complained of in this case, then you must find that the defendant had probable cause for instituting the action complained of, and your verdict must be for the defendant."
(R. 417-18.) This charge is drawn from APJI 24.12 and adapted to the circumstances of this case, where Delchamps initiated a legal action and then continued to *835 maintain it after the facts surrounding J.S. Bryant's possible alibi came to light. The defense of advice of counsel requires a showing of full disclosure of the facts, with proper diligence on the part of the client in disclosing the facts, and a proper motive in seeking legal advice upon which to rely. Roberson v. McCarley, 259 Ala. 583, 67 So.2d 814 (1953); Abingdon Mills v. Grogan, 175 Ala. 247, 57 So. 42 (1911). When factual disputes underlie these criteria, a jury question is presented. Abingdon Mills, 175 Ala. at 250-51, 57 So. at 43-44.
The central issue in this trial was the conduct of outside counsel and his paralegal assistant in developing the facts after the potential alibi came to light. The evidence indicated, without dispute, that outside counsel made Delchamps aware of the inconclusive status of his investigation of the validity of J.S. Bryant's alibi of incarceration at the time of the offense. Under the previously quoted instruction to the jury dealing with the defense of advice of counsel, the jury, before it could find in favor of Delchamps, had to be reasonably satisfied as to the competence of the Delchamps lawyer to render the advice and Delchamps's reliance upon that advice in making the decision to proceed. J.S. Bryant challenged the qualifications of outside counsel in criminal matters, presented evidence indicating that counsel made an inadequate factual investigation, and offered evidence indicating Delchamps was zealous to obtain a conviction.
Under the evidence presented, viewed in a light most favorable to J.S. Bryant, and under the authorities previously discussed dealing with the evidence required to support a claim of malicious prosecution, we hold that the plaintiff presented sufficient evidence of recklessness, coupled with a lack of good faith, from which malice could be inferred in Delchamps's decision to proceed in the face of its knowledge that there had not been a conclusive resolution of the facts surrounding J.S. Bryant's alibi. Such conduct is not shielded as a matter of law by reason of the defense of advice of counsel, because of the aforementioned underlying jury questions surrounding the availability of the defense.

VI.
Delchamps next contends that the trial court erred when it granted J.S. Bryant's motion in limine, thus precluding it from disclosing to the jury the crime for which he had been convicted. J.S. Bryant testified that he had pleaded guilty to two counts of a felony, that he had been sentenced to three years in prison, and that he never had been released on a pass or a furlough. The trial court, applying Rule 403, Ala. R. Evid., concluded that the probative value of evidence regarding the nature of the offense was outweighed by the danger of unfair prejudice. This determination was within the trial court's discretion. Ott v. Smith, 413 So.2d 1129 (Ala. 1982).
Bryant limited his claim for damages to mental anguish and sought no recovery for injury to his reputation. Where damages for injury to the reputation are claimed in an action for malicious prosecution, evidence of a prior conviction for the same offense made the basis of an alleged malicious prosecution is admissible. Pittman v. Johnson, 224 Ala. 291, 140 So. 371 (1932). In addition, evidence of previous trials and convictions is admissible where such damages are claimed, to challenge the extent of the plaintiff's embarrassment. Long v. Mann, 259 Ala. 17, 65 So.2d 500 (1953). Whether a motion in limine dealing with the nature of the offense is appropriate was not presented in Mann.
When a plaintiff claims damages for mental anguish and says he was humiliated, without further elaboration on the effects of the humiliation upon him, as occurred in the instant case, it is not an abuse of discretion to hold that such narrow testimony does not open the door to cross-examination as to other incidents in his life when he experienced humiliation. *836 The trial court did not err in refusing to introduce prejudicial evidence of collateral misconduct. Hargress v. City of Montgomery, 479 So.2d 1137 (Ala.1985).
Delchamps also argues that the nature of the offense is relevant to the issue of malice and absence of probable cause. Because the crime was so shocking, Delchamps says, it gave credence to the alibi and ordered an investigation. The jury knew that Delchamps learned that Bryant had been convicted of a Class A felony. We fail to see how withholding the identity of the offense prejudiced Delchamps in its effort to demonstrate its good faith in conducting its investigation of Bryant's alibi of incarceration.

VII.
Delchamps contends that the jury learned of prior acts on its part that were inadmissible and that the trial court erred in not granting a mistrial. The incident occurred when J.S. Bryant's counsel asked outside counsel for Delchamps if it was true that he had represented Delchamps in malicious-prosecution cases in the past. The question was not answered, because the trial court sustained Delchamps's objection. Delchamps's counsel did not request a curative instruction or move for a mistrial at that time. Because this error is not ineradicable, we have nothing before us to review. See Banner Welders, Inc. v. Knighton, 425 So.2d 441, 449 (Ala.1982) (holding that in the absence of an objection by counsel, a motion to exclude, or a ruling on an objection, improper argument or remarks by counsel are not subject to review unless the comment was so prejudicial that its effects were ineradicable).

VIII.
During summation, counsel for Bryant exhibited to the jury an enlargement of a letter from Delchamps's outside counsel to its corporate counsel and read therefrom the following:
"For many reasons, I am reluctant to approach Bryant's attorney, [naming attorney defending the shoplifting case], about any possible settlement."
(R. 408.) The letter had not been introduced into evidence. Delchamps contends that counsel's use of this information violated Rule 408, Ala. R. Evid., which prohibits the introduction of evidence that one offered a consideration in compromise of a claim, as proof of liability. J.S. Bryant points out that the letter was written before this action was filed, that there is no evidence of any offer to him, and that it was offered for another purpose, that is, to impeach Delchamps's contentions regarding the efforts of its outside counsel. Because the letter was not admitted into evidence, we do not reach the issue whether it falls under an exception to Rule 408. We are, nonetheless, troubled by the impropriety of counsel's arguing to the jury from a letter not offered in evidence. However, the trial court properly sustained an objection. We cannot say that a mistrial is required under these circumstances, especially in light of the fact that the reference does not constitute a settlement offer and indeed is inconsistent with the proposition that Delchamps had any liability to Bryant.

IX.
Delchamps's final argument is that the jury verdict for $400,000 in compensatory damages is excessive and that the trial court erred in not ordering a new trial or a remittitur on that basis. No punitive damages were awarded, because the plaintiff's complaint claimed only compensatory damages. Delchamps contends that J.S. Bryant's testimony as to the harm he suffered was limited to the fact that he was arrested, spent a few daytime hours in jail, had to pay $700 in attorney fees, and was concerned about the effect this arrest might have on his probation. Delchamps contends that J.S. Bryant presented no evidence from which the jury could find that he experienced mental anguish or suffering caused by those events, for example, evidence that he experienced *837 sleeplessness or incurred a loss of income or a loss of reputation. Delchamps refers to J.S. Bryant's answer at the trial in response to a question concerning how the arrest affected him: "It's hard. It's something that's hard to get over. I have been lied to and been put through humiliation." (R. 121.) Thus, Delchamps argues, the evidence does not support a $400,000 award of compensatory damages and the trial court should have either remitted the compensatory damages award or granted its motion for a new trial.
In response, J.S. Bryant argues that the jury's compensatory-damages award is supported by sufficient evidence. He states that in addition to the evidence that he had to pay $700 in attorney fees, he presented sufficient evidence of mental pain and suffering on his part, namely evidence indicating that he was awakened at his parents' home, was placed under arrest and taken to jail, was released just in time to go back to work on the night shift without a rest period, had to tell his probation officer he had been arrested, and would have been facing a minimum of 10 years in prison if he had been convicted. J.S. Bryant argues that a compensatory award is within the jury's discretion and that this Court should not substitute its judgment for that of the jury.
After carefully reviewing the trial record, we conclude that Delchamps is correct in its assertion that J.S. Bryant failed to present sufficient evidence of mental anguish to support the jury's award of $400,000 in compensatory damages. Although J.S. Bryant presented substantial evidence indicating that certain events occurred, e.g., his arrest, his hours of incarceration, and his worry about his probation, he presented no testimony or other evidence indicating the gravity of his mental anguish. The only evidence of his mental suffering was his testimony that dealing with the arrest and the subsequent prosecution was "hard" and that as a result of the arrest and prosecution he was "put through humiliation." Under Alabama law, a plaintiff in a malicious prosecution action may recover damages for mental anguish suffered as a result of the prosecution. United States Fidelity & Guaranty Co. v. Miller, 218 Ala. 158, 117 So. 668 (1928); see, also, Thompson v. Kinney, 486 So.2d 442 (Ala.Civ.App.1986), overruled on other grounds, Barrett Mobile Home Transport, Inc. v. McGugin, 530 So.2d 730 (Ala.1988). There is no fixed standard for determining the amount of compensatory damages a jury may award for mental anguish. The amount of the damages award is left to the jury's sound discretion, subject only to review by the court for a clear abuse of that discretion. First Commercial Bank v. Spivey, 694 So.2d 1316 (Ala.1997); Alabama Power Co. v. Mosley, 294 Ala. 394, 318 So.2d 260 (1975). Nevertheless, here we must address the strength of the presumption that a jury's verdict is correct, in light of J.S. Bryant's failure to testify in significant detail about the nature of his alleged mental anguish.
As we recently held, "[w]e give stricter scrutiny to an award of mental anguish where the victim has offered little or no direct evidence concerning the degree of suffering he or she has experienced." Kmart v. Kyles, 723 So.2d 572 (Ala.1998).[3] In Kmart, the plaintiff, who had been arrested for shoplifting, did not, at the third trial on her malicious-prosecution claim, testify about the mental anguish she claimed to have suffered as a result of the earlier prosecution. As a result, we wrote that, "in light of the paucity of evidence presented by the plaintiff in this case, we conclude that the jury abused its discretion in awarding her $100,000 in compensatory damages." Id. at 579. Therefore, we reduced the compensatory award to $15,000. In a footnote, we pointed out that this Court previously *838 had ordered a remittitur of compensatory damages where it was clear that the plaintiff had failed to present sufficient evidence to support the award and that the jury had abused its discretion in making that award. Id. at 579 n. 3. See Sears, Roebuck & Co. v. Harris, 630 So.2d 1018 (Ala.1993), cert. denied, 511 U.S. 1128, 114 S.Ct. 2135, 128 L.Ed.2d 865 (1994); Crosby v. Avon Products, Inc., 474 So.2d 642 (Ala. 1985); Coca-Cola Bottling Co., Montgomery v. Parker, 451 So.2d 786 (Ala.1984).
In Foster v. Life Ins. Co. of Georgia, 656 So.2d 333 (Ala.1994), this Court stated:
"We recognize that mental anguish and emotional distress are not items for which a precise amount of damages can be assessed; thus, in considering whether a jury verdict for compensatory damages is excessive, we must view the evidence from the plaintiff's perspective and determine what the evidence supports in terms of the plaintiff's suffering. Pitt v. Century II, Inc., 631 So.2d 235 (Ala.1993). In this case, the only evidence regarding Foster's mental anguish and emotional distress is her bare assertion that the discovery of fraud affected her `a lot' and that she sued two months after the mental anguish and emotional distress began. From this limited evidence, we agree that the jury could infer that Foster suffered some measure of mental anguish and emotional distress from the realization that she had been paying over a fifth of her monthly income to an insurance company for a worthless policy; however, we hold that, even when viewed in a light most favorable to her, Foster's scant testimony of mental anguish and emotional distress, without more, does not support an award exceeding $120,000 for each of the two months before she sued. We conclude that the $250,000 compensatory damages award was excessive by $200,000."
656 So.2d at 337.
Like the plaintiff in Foster, J.S. Bryant gave scant direct testimony about mental anguish. He described his arrest and being taken to jail, hiring an attorney, and the lapse of time between his arrest and the nol-prossing of his case less than two months later. During this interval, he was concerned lest a conviction lead to his return to prison for a minimum of 10 years. The mental anguish here described is of limited duration. We are not dealing with an event that will continue to inflict great pain through the years, such as the loss of a loved one. While the virtue of stoically dismissing one's suffering by limiting any description of it to a few terse words has its place, the courtroom is not one of them if the person suffering is a plaintiff who expects a significant award to pass judicial scrutiny. The absence of evidence to corroborate J.S. Bryant's description of the intensity of his suffering, i.e., evidence referring to quantifiable effects, whether from J.S. Bryant himself, from family members, or from a professional, leads us to conclude that the jury abused its discretion in awarding $400,000 in compensatory damages. J.S. Bryant testified that he paid approximately $700 in attorney fees to defend the criminal action; this leaves more than $399,000 allocable solely to the claim of mental anguish. We believe that the greatest amount of compensatory damages a jury, using sound discretion and guided by proof sufficient to warrant an award of such damages, could have awarded J.S. Bryant based on the evidence is $100,000. Accordingly, we conclude that the trial court erred in denying Delchamps's motion for a remittitur of damages or a new trial. If J.S. Bryant does not accept a remittitur of the compensatory damages award from $400,000 to the sum of $100,000, Delchamps must be granted a new trial.[4]

*839 X.
The judgment is affirmed on the condition that J.S. Bryant file with this Court within 21 days a remittitur of compensatory damages to the sum of $100,000; otherwise, the judgment will be reversed and the cause remanded for a new trial.
MOTION TO STRIKE GRANTED; AFFIRMED CONDITIONALLY.
HOOPER, C.J., and MADDOX and HOUSTON, JJ., concur.
SEE, J., concurs in the result.
KENNEDY and COOK, JJ., concur in part and concur in the result in Part IX.
JOHNSTONE, J., concurs in part and dissents in part.
KENNEDY, Justice (concurring in part; concurring in the result in Part IX).
Although I concurred in Kmart v. Kyles, 723 So.2d 572 (Ala.1998), I disagree with what I see in today's case as an inappropriate extension of the standard applied in that case. The plaintiff in Kmart offered no personal testimony regarding the degree of suffering she had experienced, and there was little evidence of any kind upon which the jury could draw in awarding damages for mental anguish. Under the specific facts of that case, I joined the opinion holding that the mental-anguish award should be subject to more intensive review.
However, I do not believe that direct testimony from the plaintiff regarding the extent of his or her mental anguish is necessary, or should be required, in order for a mental-anguish award to be upheld on appeal. In this case, the plaintiff testified at length regarding the events that occurred and about his concern that his probation might be revoked. This present case does not present a situation like that in Kmart, where there was little or no direct evidence to support the jury's award.
I concur in the main opinion, except as to Part IX. I concur in the result of Part IX, ordering a remittitur of compensatory damages to $100,000.
COOK, Justice (concurring in part; concurring in the result in Part IX).
I concur with all of the main opinion except Part IX. I concur in the result in Part IX and concur in the remittitur of compensatory damages to $100,000.
Last term, this court adopted a significant modification of Alabama law in Kmart v. Kyles, 723 So.2d 572 (Ala.1998), by stating that this court will "give stricter scrutiny to an award of mental anguish where the victim has offered little or no direct evidence concerning the degree of suffering he or she has experienced." 723 So.2d at 578. I did not join in that opinion, and I continue to have reservations regarding this "new rule" because I do not believe that the quantum of the evidence in an action seeking damages for mental anguish requires any greater level of review than that applied in determining whether the verdict is supported by the evidence. In other words, I am uncertain as to the meaning of the phrase "direct evidence concerning the degree of suffering ... experienced." If by the offer of "direct evidence," where a substantial verdict is involved, it is meant that the plaintiff's own testimony is required in order to provide to the jury a picture of the mental anguish, excruciating or otherwise, to the diminishment of all other methods through which evidence may be presented to make a prima facie case, I believe the main opinion misses the point. I believe the measuring rod to be all of the evidence, from whatever source and offered through whatever manner, that is admissible, from which the factfinder can determine the nature of extent of the mental anguish suffered. In the final analysis, the test of excessiveness, as acknowledged by the main opinion, remains the same, i.e., what is the greatest amount of compensatory damages a properly functioning jury, using sound discretion and guided by all of the evidence, could have awarded. If the amount *840 awarded by the jury rests within the limits supported by the evidence, the verdict is not excessive and should not be disturbed.
On the other hand, if the main opinion is referring to the absence of evidence, then I think this court's precedent as indicated by Foster v. Life Ins. Co. of Georgia, 656 So.2d 333 (Ala.1994), a case in which I joined and in which the main opinion finds no fault as providing a proper sufficiency analysis, is adequate.
To be sure, we are not focusing on shades or degrees of mental anguish suffered. If we were, it would not matter whether the evidence was direct or indirect. As a classic example of indirect evidence, commonly referred to as "circumstantial evidence,"[5] reveals, it would not matter whether there was testimony from a witness that the witness saw an unidentified person enter through a window or if there was evidence of footprints in mud outside a window, a window broken and left open with muddy footprints inside the building, to prove that an entry occurred through that particular window. Similarly in an action for damages for mental anguish, it should not matter if the plaintiff's own testimony reveals emotional distress or if testimony comes from witnesses establishing emotional distress sufficient to carry the burden of proof.
My reservation regarding this new test at this point is that we may be elevating form over substance, that is, focusing on the type of evidence presented, to the diminishment of focusing on the nature and degree of mental anguish suffered. I therefore concur in the result of Part IX.
JOHNSTONE, Justice (concurring in part and dissenting in part).
I concur with the main opinion insofar as it holds Delchamps liable on the theory of malicious continuation of the prosecution. I dissent insofar as the main opinion holds that the evidence is insufficient to support the plaintiff's theory of malicious initiation of the prosecution. I further dissent from the rationale of the main opinion in remitting the plaintiff's award for mental suffering.
I will address, first, the error in holding that the record does not contain substantial evidence to support liability on the theory of malicious prosecution in the initiation of the shoplifting charge against the plaintiff. The main opinion cites the three Delchamps employees' identifications of the plaintiff as the shoplifter as evidence of probable cause that he was in fact the shoplifter. On the contrary, these identifications, which the record conclusively proves to be false, are a burden, not an exoneration, for Delchamps. A corporation misbehaves only through the misbehavior of its agents, servants, or employees. A misidentification, a want of probable cause, and a lack of good faith in the Delchamps employees constitute respectively a misidentification, a want of probable cause, and a lack of good faith in Delchamps itself under the theory of respondent superior.
In this case, Delchamps employee Scott observed the shoplifter to have a full beard and curly hair and so described the shoplifter to the investigating deputies, but then selected from the photographic lineup the picture of a man with no full beard and no curly hair but only several days' growth of beard, and unkempt hair, and identified the person so depicted, the plaintiff, as the shoplifter. This misconduct by Delchamps employee Scott invokes the consequences of the rule cited by the main opinion as follows:
"There need be no personal ill will, hate, desire for revenge, or other base and malignant passion. Whatever is done willfully and purposely, whether the motive be to injure the accused, to gain some advantage to the prosecutor, or through mere wantonness or carelessness, if it be at the same time wrong and unlawful within the knowledge of the actor, is in legal contemplation maliciously done." Lunsford v. Dietrich, 93 Ala. 565, 569, 9 So. 308, 310 (1891). *841 The other two Delchamps employees, Champion and Raines, ostensibly saw the same features on the shoplifter; but employee Champion made the same photographic line-up misidentification as employee Scott, with the same legal consequences as those attendant to Scott's misidentification. The third Delchamps employee, Raines, could be no more certain in his identification from the photographic line-up than to select two of the photographs, one of which depicted the plaintiff. Delchamps is chargeable with knowledge of this uncertainty. From this evidence the jury could reasonably have inferred the existence of all the disputed essential elements of liability in the plaintiff's claim for malicious initiation of the shoplifting prosecution.
Sheriff's Sergeant McGuffie's early statement that the plaintiff might have committed the shoplifting while on a pass or a furlough from the penitentiary is, on its face, mere speculation, as McGuffie admitted in his testimony. Such mere speculation is not even substantial evidence of good faith by Delchamps, much less the conclusive proof of good faith necessary to invalidate a finding of liability on the theory of malicious initiation of the prosecution.
Thus the trial court should be affirmed on the theory of malicious initiation, as well as continuation, of the prosecution. Fortunately, the affirmance on the theory of malicious continuation prevents the erroneous holding against the malicious initiation theory from affecting the parties to the case.
Second, I dissent from the holding that the plaintiff's award should be reduced pursuant to the new rule promulgated by Kmart Corp. v. Kyles, 723 So.2d 572 (Ala. 1998), to the practical effect that the Court will invoke an absence or a paucity of direct evidence of mental suffering as a reason for reducing a jury award for mental suffering, notwithstanding the indirect, objective evidence that persuaded the fact finder to assess the award in the first place. In Kmart this Court performed some judicial legislating; and, in the case at issue, the Court dignifies that judicial legislation as judicial precedent.
Specifically, in Kmart, this Court created the requirement that a plaintiff introduce direct evidence of his or her mental suffering in order to avoid the "stricter scrutiny" that the Court announced it would impose on mental suffering verdicts based only on indirect, albeit objective and reliable, evidence, such as the acts committed against, or tangible losses suffered by, the plaintiff. The logical (but bad) extension of this new requirement would be that plaintiffs seeking compensation for physical pain resulting from even the most horrible acts and injuries will need to emote pathetically to the finder of fact in order to avoid the "stricter scrutiny."
To adopt the Kmart rule, this Court contended that the evolution of the rules of evidence to allow direct evidence of mental suffering distinguished Kmart from all previous cases and thereby made Kmart a case of first impression. Of course, the rules of evidence evolved to allow direct evidence of mental suffering many years before Kmart, as Kmart itself reveals by citing Hardie v. State, 260 Ala. 75, 68 So.2d 35 (1953), which, in turn, tells the history of the evolution, with a case as early as 1929, Alabama Power Co. v. Edwards, 219 Ala. 162, 166, 121 So. 543, 546 (1929), wherein a witness was allowed to testify, "I was scared." Nonetheless, in 1998, between fifty and seventy years and countless cases after Alabama jurisprudence established the admissibility of direct evidence of mental suffering, the Kmart Court held that this development in the law rates as a distinguishing feature such a distinguishing feature that Kmart could be treated as a case of first impression and an opportunity for a new burden on plaintiffs. The operative words in Kmart are:
"We now[6] clearly allow the testimony of a witness as to his or her mental anguish. *842 The question thus remains, in the present era,[7] when we permit a witness to offer evidence as to the witness's own mental anguish, is indirect evidence of mental anguish alone sufficient to support a substantial verdict? We answer this question in the negative. We give stricter scrutiny to an award of mental anguish where the victim has offered little or no direct evidence concerning the degree of suffering he or she has experienced." Kmart, 723 So.2d at 578 (emphasis added).
The Kmart rationale is defective in several ways. First, the over-fifty-year-old change in the rules of evidence is hardly a feature that distinguishes Kmart from the countless intervening cases of mental suffering.
Second, the new Kmart burden contravenes the fundamental purpose of the rules of evidence: to promote the most reliable forms of proof. Rarely does our law presume to dictate to parties the types of admissible evidence they must introduce or combine to prove a fact. In those rare instances where the law does require corroboration, the purpose of the law is to buttress some inherently suspect form of evidence, such as the testimony of a criminal accomplice against a defendant in a criminal prosecution, or testimony by someone that he or she is the agent of another for purposes of binding that other. The new Kmart rule does just the opposite: it requires the least reliable of all forms of evidencesubjective, self-serving emotingostensibly to buttress the most reliable form of evidence of mental suffering the objective facts of the acts committed against, and the tangible losses suffered by, the plaintiff.
The third defect in the new Kmart rule is that it often will confront the plaintiff with the dilemma of losing either way the plaintiff presents his or her case. Many jurors are repelled by a plaintiff's testimony of his or her own suffering. Yet Kmart requires the plaintiff to antagonize these jurors in order to satisfy the Court!
The fourth defect in the Kmart rule, at least as applied in the main opinion in the case at issue, is that it invites testimony by "a professional," 738 So.2d at 838, as an option for direct evidence to corroborate mental suffering. On the one hand, such evidence is admissible. On the other hand, of all the subjects within the ken of the typical jury and therefore without the need for expert testimony, the mental anguish attendant to a false accusation would seem to be the foremost. This country is now crawling with "experts" with more credentials than integrity. We need to avoid unnecessarily inviting an increase in demand for these people.
The fifth defect in the new Kmart rule is that it does not put the Court one iota closer to a fair way of judging whether mental suffering awards are excessive or not. The case at issue is a prime example. This plaintiff introduced enough evidence (to some extent minimized in the main opinion), mostly indirect and objective, but some direct, to persuade the jury to award $399,300 for mental suffering. This Court is ordering a remittitur. Suppose, now, that the plaintiff had submitted to the new rule (not then in effect) and had testified as follows:
"Oh, it was the most horrible experience of my life. I cried and cried and wrung my hands until my bones were sore. I had a knot in my stomach and a splitting headache and I didn't sleep a wink for two months, all because of what Delchamps did to me."
Would this testimony have deterred the Court from remitting the verdict? If so, would the new rule have promoted justice? If we would have remitted the verdict anyway, would we have been honoring the new rule? Remotely possibly, we might have agreed on less of a remittitur simply because of the additional evidence, but not because the direct evidence would have *843 given us greater insight to the truth than a like quantity of additional indirect, objective evidence. Our more likely reaction, however, would have been to conclude, as the jury probably would have concluded under this scenario, that the plaintiff was either a liar or a sissy or both, who deserved little award if any at all.
Because the new rule will serve no legitimate purpose and will cause so much trouble, Kmart should be overruled. The question remains, however, what is a legitimate way to review mental anguish verdicts for excessiveness?
In the case at issue, this Court ultimately justifies remittitur by resorting to the finding, or test, that the jury abused its discretion. This test is presently undefined. While abuse of discretion by the jury can be a useful test, we need to define it to ensure that we do not confuse our role and theirs.
The legislature has adopted a definition of substantial evidence in § 12-21-12(d), Ala.Code 1975, to specify the weight and quality of evidence necessary to support a finding of liability and to prove compensatory damages. While this standard heretofore has been used principally to decide motions for summary judgment, motions for judgment as a matter of law, and motions to strike damages for lack of proof, this same standard provides the institutional reliability and the intellectual rigor necessary to define abuse of discretion by the jury.
Subsection 12-21-12(d), as clarified by this Court in West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989), provides that evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." (Emphasis added.) If the evidence concerning mental anguish in a case is of such weight and quality that fair-minded jurors in the exercise of impartial judgment could have reasonably inferred that the plaintiff suffered mental anguish to the extent of the verdict amount, the jury cannot legitimately be deemed to have abused its discretion in returning that verdict. Thus, abuse of discretion in this context should be defined as returning an award for mental anguish substantially greater than fair-minded jurors, in the exercise of impartial judgment, could reasonably have inferred from the evidence that the plaintiff suffered.[8] Such a verdict would be excessive and subject to remittitur to the extent of the excess. In the event the Court should find a verdict excessive by this standard, the Court should remit it only to the least extent necessary to conform it to the standard. A verdict should not be deemed excessive as an abuse of discretion by the jury if fair-minded jurors, in the exercise of impartial judgment, could reasonably have inferred from the evidence that the plaintiff suffered mental anguish to the extent of the verdict amount.
In reviewing a verdict for excessiveness, the Court must exercise intellectual discipline in deferring to the prerogative of the jury to decide whether the evidence proves the sum awarded. The issue for the Court is not whether the evidence proves the sum awarded, but whether the jury, performing to the standard, could reasonably have concluded that the evidence proves the sum awarded. Finally, the reviewing judge or justices should heed the well settled law that the courts must deem as true the tendencies of the evidence most favorable to the verdict winner. Sealing Equipment Products Co. v. Velarde, 644 So.2d 904, 910 (Ala.1994).
NOTES
[1] We note that during the course of the trial, Delchamps moved for a JML at the close of the plaintiff's evidence and again at the close of all the evidence.
[2] Recklessness and carelessness mean substantially the same degree of fault, and each falls short of wantonness. Edwards Dodge, Inc. v. Pennsylvania Nat'l Mut. Cas. Ins. Co., 510 So.2d 225 (Ala.1987); Merrill v. Sheffield Co., 169 Ala. 242, 53 So. 219 (1910).
[3] The trial court overruled Delchamps's post-judgment motion on April 15, 1998, before this Court released Kmart v. Kyles on May 22, 1998.
[4] In the event of a new trial, should J.S. Bryant go further than he did at the second trial and offer evidence to substantiate a more significant award of compensatory damages for mental anguish, the prejudicial effect of evidence regarding his conviction for sodomy might then be outweighed by its probative value.
[5] Black's Law Dictionary 243 (6th ed.1990).
[6] See footnote 7.
[7] These words reflect the insupportable premise that the Court is confronted with a new or novel issue, when, in fact, this state of the law is at least a half century old.
[8] Of course, verdicts including damages for future mental anguish should be reviewed by the same test, adapted to the existing requirement that future mental anguish must be proved with reasonable certainty.